**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF LOUISIANA**
**LAKE CHARLES DIVISION**

| | |
|---|---|
| THE STATE OF LOUISIANA, by and through its Attorney General, Liz Murrill;<br><br>THE STATE OF ARKANSAS, by and through its Attorney General, Tim Griffin; and<br><br>THE STATE OF ALABAMA, by and through its Attorney General, Steve Marshall;<br><br>PLAINTIFFS,<br><br>v.<br><br>BRANDON NOUHAVANDI;<br><br>JESSICA NOUHAVANDI;<br><br>JBN OPERATIONS LLC;<br><br>CAMBRIDGE REPRODUCTIVE HEALTH CONSULTANTS (D/B/A THE MASSACHUSETTS MEDICATION ABORTION ACCESS PROJECT);<br><br>ANGEL FOSTER;<br><br>SUSAN YANOW;<br><br>MAUREEN PAUL;<br><br>REMY COEYTAUX;<br><br>MARGARET SIMEONE;<br><br>A SAFE CHOICE INC.;<br><br>A SAFE CHOICE NETWORK INC.;<br><br>REMY COEYTAUX, MD, PC (D/B/A CHOIX REPRODUCTIVEHEALTH); | Civ. No.:<br><br>Judge:<br><br>Mag. Judge: |

OPTIO WOMEN'S HEALTH, INC.;

ABUZZ, LLC;

MANISHA KUMAR;

ISHANI VILLAGE LLC;

CHRISTIE PITNEY;

CHRISTIE PITNEY NURSING AND REPRODUCTIVE HEALTH INC. (D/B/A FORWARD MIDWIFERY, NURSING, AND REPRODUCTIVE HEALTH);

FORWARD MIDWIFERY PLLC;

ROBIN TUCKER;

R. TUCKER LIMITED (A/K/A R. TUCKER CHARTERED, A/K/A METRO AREA ADVANCED PRACTICE HEALTHCARE);

METRO AREA MODERN REPRODUCTIVE CARE, LLC (D/B/A ROXY CLINIC);

CHARLENE EISENBERG REPRODUCTIVE HEALTH COLLABORATIVE, INC. (A/K/A CE REPRO, A/K/A CE REPRO FUND);

PEA CONN LLC (D/B/A SOUTHERN WOVEN);

SOUTHERN WOVEN HEALTH PLLC (A/K/A WOVEN HEALTH PARTNERS);

ONE PLUS FOUR LLC (D/B/A WE TAKE CARE OF US);

ROBIN HEWLETT;

CSA ASC LLC (D/B/A WE TAKE CARE OF US);

TIMOTHY PAIK-NICELY; AND

| |
|---|
| WITH OPEN ARMS CENTER FOR REPRODUCTIVE CHOICES, INC. (D/B/A CHOICES RISING),<br><br>DEFENDANTS. |

**COMPLAINT**

**(NOTICE: Graphic images appear on pages 81–83.)**

1. In our constitutional system, the sovereign, co-equal states are endowed with the power and responsibility to regulate within their borders for the health and safety of their citizens.

2. This case involves a sweeping, coordinated scheme to violate such laws through individuals and organizations who do not reside in the forum states and swear to never set foot in those states. They instead advertise illegal services online in the forum states, accept payments for certain products from individuals in those states, and then illegally ship those products to addresses in those states. This is not accidental or incidental: They acknowledge that their conduct is illegal—some even do business *only* in states where their conduct is illegal, and others send 95% of their monthly shipments to such states.

3. Our constitutional system does not tolerate such blatant disregard for a state's sovereign authority. That is true regardless of the nature of the products being unlawfully shipped into the forum state. It does not matter whether the package contains anthrax, mail bombs, or chemical weapons intended to harm individuals within that state, or (as is the case here) abortion drugs.

4. That is why Plaintiffs Louisiana, Arkansas, and Alabama bring this suit. As sovereign states, they wield traditional police powers within their borders, enforcing democratically enacted laws for the health and safety of their citizens. Among such laws are specific restrictions on abortion, including a general prohibition on abortion with narrow exceptions and a prohibition on the

dispensing of abortion drugs by mail. Those laws protect the lives and health of unborn babies and their mothers—and they reflect careful policy choices adopted through each State's democratic process. Some may disagree with these policy choices, but they are the law within Plaintiff States. Indeed, this was the Supreme Court's promise in *Dobbs v. Jackson Women's Health Organization*, 597 U.S. 215 (2022): that each sovereign state may "regulate abortion as its citizens wish." *Id.* at 230.

5. Notwithstanding the promise of *Dobbs*—and notwithstanding Plaintiff States' laws—abortions have proliferated by the thousands within Plaintiff States' borders. Not because of local doctors and nurses, or even underground abortionists, risking arrest by violating those laws. Rather, it is because of an army of individuals and organizations in *other* states like California, New York, and Massachusetts fixed on perpetrating "a scheme to undermine [the Supreme Court's] decision in *Dobbs*." *Danco Lab'ys, LLC v. Louisiana*, 146 S. Ct. 1192, 1193 (2026) (Alito, J., dissenting). They are some of the defendants in this case—and their mission is "to operationalize [their] middle-finger rage," "thwart red-state attorneys general," and "thwart draconian anti-abortion laws."[1]

6. The scheme is simple. The organizations operate websites advertising abortion drugs in Plaintiff States. The organizations use a short questionnaire in which website users (anonymous men, women, and children) can represent (or misrepresent) their alleged pregnancy status. The website users then pay a fee for the abortion drugs or represent that they cannot afford the fee (in which case most organizations will assume the cost). Some organizations then use mail-order pharmacies to ship the drugs (predominantly from California) to addresses in Plaintiff States; others handle their own shipments after "pill-packing parties [] fueled by pizza and wine."[2] The drugs are then used to abort

[1] *See generally* Nina Martin, *She's Remaking the Abortion Landscape One Pill at a Time*, Mother Jones (July 31, 2026), perma.cc/E8AJ-N8P6 (attached as Ex. 1).

[2] *Id.* at 4.

babies in Plaintiff States and, in documented instances, send women to emergency rooms with severe bleeding and excruciating pain.




A typical daily run to the nearby post office includes hundreds of packages bound for all 50 states. Emily Schiffer

7. The organizations carry out this scheme by widely advertising that abortion drugs are "safer than Tylenol" or even "driving a car." They also severely downplay the rate and nature of adverse reactions to abortion drugs that frequently demand emergency care. And if emergency care is necessary, they actively encourage women to lie to healthcare providers in Plaintiff States by saying that they are simply suffering a miscarriage.

8. All this violates Plaintiff States' laws. The organizations openly acknowledge as much. But they think themselves invincible because their agents swear to never set foot in Plaintiff States (thereby avoiding arrest), and their home states have enacted so-called "shield laws" intended to thwart legal liability for individuals perpetrating this interstate abortion scheme.

9. By abridging Plaintiff States' traditional authority to regulate the practice of medicine, this interstate scheme places the lives and health of women, girls, and unborn babies in Plaintiff States at risk. Plaintiff States' laws exist for a reason: to protect life and to ensure that appropriate safeguards are in place in the narrow circumstances where an abortion might be permitted. Today, however, abortion drugs are flooding into Plaintiff States in open defiance of their laws—and Plaintiff States alone are bearing the human and economic costs of that scheme.

10. The organizations and individuals behind this scheme are free to disagree with Plaintiff States' policy decisions—but they are not free to disregard them, especially at the expense of women, girls, and babies in Plaintiff States. Accordingly, Plaintiff States have taken extraordinary measures to counter this attack on their sovereign authority. Those include cease-and-desist letters, subpoenas, criminal enforcement actions, and even a lawsuit against the U.S. Food and Drug Administration. So far, however, nothing has stopped the deliberate flood of abortion drugs into Plaintiff States.

11. Louisiana's own experience well illustrates the problem. Of Louisiana's request for assistance in holding a New York doctor accountable for the death of a teenager's baby, Governor Kathy Hochul said, "[T]here's no way in hell that I'll ever respond to a request to extradite [the doctor] and face criminal charges."[3] Responding to Louisiana's similar request concerning a California doctor responsible for the death of a domestic abuse victim's baby, Governor Gavin Newsom was more pointed: "@AGLizMurrill: Go fuck yourself."[4]

[3] Press Release, Office of N.Y. Governor Kathy Hochul, *Protecting Reproductive Freedom: Governor Hochul Signs Legislation Affirming New York's Status as a Safe Haven for Reproductive Health Care* (Feb. 3, 2025), perma.cc/G5PY-7VHD (attached as Ex. 2). The audio recording linked in the release is available at perma.cc/8L5R-VEBJ.

[4] Gavin Newsom (@GavinNewsom), X (Feb. 5, 2026), perma.cc/5532-P3BS (attached as Ex. 3).




12. This cross-border assault on Plaintiff States is clear and undeniable—and it is a "classic" public nuisance under federal common law. *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (citation omitted); *accord Cranor v. 5 Star Nutrition, L.L.C.*, 998 F.3d 686, 691–92 (5th Cir. 2021).

13. At its core, the federal common law of public nuisance protects a sovereign state's "interest in the abatement of public nuisances, instances in which the injury to the public health and comfort [is] graphic and direct." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 604 (1982). A state thus may, for example, sue to enjoin an out-of-state entity's "noxious" discharge of items across state lines and into the suing state. *See id.* at 603–04 (citing *Missouri v. Illinois*, 180 U.S. 208 (1901); *Ga. v. Tenn. Copper Co.*, 206 U.S. 230 (1907)). Similarly, a state may sue over "the keeping of diseased animals," "the practice of medicine by one not qualified," or any number of other interferences with "the public health" that fall within the "broad category" of public nuisances. *Cranor*, 998 F.3d at 691 (citation omitted); *accord Michigan v. U.S. Army Corps of Eng'rs*, 667 F.3d 765, 771–72 (7th Cir. 2011) (applying federal common law and emphasizing that "[p]ublic nuisance traditionally has been understood to cover a tremendous range of subjects" (citing examples)).

14. Relevant here, a state also may sue to enjoin conduct "not warranted by law, ... which obstructs or causes inconvenience or damage to the public in the exercise of rights common to all." *Cranor*, 998 F.3d at 691 (quoting Restatement (Second) of Torts § 821B cmt. a (Am. L. Inst. 1979)). Put otherwise, "conduct … proscribed by a statute" presents a quintessential public nuisance, especially where it involves "a significant interference with the public health" and the perpetrator "knows" of that "continuing" harm. Restatement (Second) of Torts § 821B(2) & cmt. d; *accord City of*

*Huntington v. AmerisourceBergen Drug Corp.*, 157 F.4th 547, 566–69 (4th Cir. 2025) ("One means of demonstrating an unreasonable interference with a public right is to show that a defendant's act or causal contributions to that act were 'unlawful.'" (citing the Restatement)); *Baptiste v. Bethlehem Landfill Co.*, 965 F.3d 214, 220 (3d Cir. 2020) (applying the Restatement to find a public nuisance based on the defendant's "alleged failure to operate its facility in accordance with [state law]").

15. The federal common law of public nuisance squarely forecloses the defendants' interstate scheme to circumvent Plaintiff States' laws. The very act of dispensing abortion drugs by mail throughout Plaintiff States is "proscribed by" Plaintiff States' laws. Restatement (Second) of Torts § 821B(2)(b). The drugs are "a significant interference with the public health," *id.* § 821B(2)(a)—by design, they are intended to terminate pregnancies, thereby ending the lives of thousands of unborn babies in Plaintiff States and sending mothers to emergency rooms because of drug complications. Worse, the organizations behind this scheme and their facilitators "know[]" about this "continuing" harm *because that is their mission*. *Id.* § 821B(2)(c). They advertise in, and send abortion drugs into, Plaintiff States for the avowed purpose of undermining our pro-life laws. Recently asked about this point, one defendant's employee giggled: "It made me so happy ... when [Justice Alito] wrote, 'They're undermining *Dobbs*.' I was like, *yeah*, *exactly*."[5]

16. The federal common law of public nuisance, moreover, is uniquely suited and necessary to resolve this cross-border conflict. Federal common law governs "areas of national concern," including "where the basic scheme of the Constitution so demands" and where a suing state's harm "emanat[es] from another State." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 421 (2011) (citation omitted). That is precisely the case here given the functional nullification of Plaintiff States' laws—and Plaintiff States' subordination to the policy preferences of pro-abortion states and

[5] Ex. 1 at 7.

their citizens. *See Alfred L. Snapp & Son, Inc.*, 458 U.S. at 607 (noting the propriety of a state suit where the "injury is one that the State, if it could, would likely attempt to address through its sovereign lawmaking powers"); *id.* at 607–08 (recognizing a state's "[d]istinct" "interest in securing observance of the terms under which it participates in the federal system"). Indeed, in circumstances like this, the application of federal common law in federal court is virtually a "duty" because Plaintiff States have "surrendered" "the right to make war," which otherwise would provide a defense against out-of-state aggressors. *Missouri*, 180 U.S. at 241.

17. In "our historic tradition," "the States enjoy 'equal sovereignty.'" *Nw. Austin Mun. Utility Dist. No. One v. Holder*, 557 U.S. 193, 203 (2009) (citing *United States v. Louisiana*, 363 U.S. 1, 16 (1960)); *accord Shelby County v. Holder*, 570 U.S. 529, 544 (2013) ("[T]he constitutional equality of the States is essential to the harmonious operation of the scheme upon which the Republic was organized." (quoting *Coyle v. Smith*, 221 U.S. 559, 580 (1911))). That was the tradition the *Dobbs* Court upheld by "return[ing]" to "the citizens of each State" the authority to regulate abortion as they see fit. 597 U.S. at 302. This is the tradition that the defendants avowedly seek to undermine by deliberately violating Plaintiff States' laws designed to protect human life. And that is the tradition this lawsuit will vindicate.

18. If state sovereignty means anything, it means that states like Louisiana, Arkansas, and Alabama cannot be forced to endure open violations of their laws, deaths of their babies, and harms to their women and girls simply because an out-of-state actor disagrees with their sovereign prerogative to choose life within their borders.

## PARTIES

19. Plaintiff Louisiana is a sovereign state of the United States. This action is brought on behalf of Louisiana by Attorney General Liz Murrill, who is legally authorized to sue on its behalf. Her offices are located at 1885 N. Third St., Baton Rouge, Louisiana 70802.

20. Plaintiff Arkansas is a sovereign state of the United States. This action is brought on behalf of Arkansas by Attorney General Tim Griffin, who is legally authorized to sue on its behalf. His offices are located at 101 W. Capitol Ave., Little Rock, Arkansas 72201.

21. Plaintiff Alabama is a sovereign state of the United States. This action is brought on behalf of Alabama by Attorney General Steve Marshall, who is legally authorized to sue on its behalf. His offices are located at 501 Washington Ave., Montgomery, Alabama 36104.

22. Defendant Cambridge Reproductive Health Consultants, Inc. (d/b/a The Massachusetts Medication Abortion Access Project (The MAP)) is a 501(c)(3) tax-exempt organization, with its principal place of business at 98 Electric Ave., Suite #1, Somerville, Massachusetts 02144. The MAP is "a non-profit, asynchronous telemedicine Shield Law practice in Massachusetts that provides medication abortion care to patients from all 50 states."[6] The MAP operates under the domains themap.wspr.health, cambridgereproductivehealthconsultants.org, and cambridgereproductivehealthconsultants.org/map.

23. Defendant Angel Foster is the president and a co-founder of Cambridge Reproductive Health Consultants, Inc. She also serves as its registered agent for service of process at 98 Electric Ave., Apt. #1, Somerville, Massachusetts 02144. In September 2023, Foster launched The MAP within Cambridge Reproductive Health Consultants, Inc., and runs its daily operations today.[7]

24. Defendant Susan Yanow is The MAP's director of community engagement. She is a resident of Massachusetts.

25. Defendant Maureen Paul is The MAP's medical director. She is a resident of Massachusetts.[8]

---

[6] The MAP, *Abortion Pills by Mail—Private & Affordable Abortion Care*, perma.cc/2MRU-YZ7J (last visited Sept. 24, 2026) (attached as Ex. 4).

[7] *See* Ex. 1 at 2–3, 21.

[8] *See id.* at 6.

26. Defendant Remy Coeytaux is a resident of California.

27. Defendant Margaret Simeone is a resident of California.

28. Defendant A Safe Choice Inc. is a California corporation formerly known as Abortion Care at Home Inc. It was incorporated by Defendant Coeytaux in June 2024. The corporation's address is 548 Market St. #752820, San Francisco, CA 94104. The registered agent for the corporation is United States Corporation Agents, Inc., 500 N. Brand Blvd. Glendale, CA 91203.

29. Defendant A Safe Choice Network Inc. is a California corporation initially registered by Defendant Coeytaux as incorporator in January 2026. Also in January 2026, Coeytaux signed a statement of information listing Defendant Simeone as chief executive officer, chief financial officer, and secretary of A Safe Choice Network Inc. A Safe Choice Network Inc. operates the domain asafechoicenetwork.com. The corporation's address is 455 Market St., Ste. 1940 #611906, San Francisco, CA 94105. The registered agent for the corporation is United States Corporation Agents, Inc., 500 N. Brand Blvd. Glendale, CA 91203.

30. Defendant Remy Coeytaux, MD, PC (d/b/a Choix ReproductiveHealth) is a California corporation located at 8911 Lakewood Dr., Ste. 25B, Windsor, CA 95492.[9] Defendant Coeytaux is its chief executive officer, chief financial officer, and secretary. Its mailing address is P.O. Box 215, Healdsburg, CA 95448. The registered agent for the corporation is United States Corporation Agents, Inc., 500 N. Brand Blvd. Glendale, CA 91203.

31. Defendant OPTIO Women's Health, Inc. is a California corporation located at 8911 Lakewood Dr., Ste. 25B, Windsor, CA 95492. OPTIO Women's Health, Inc. operates the domain optiowomenshealth.com. Its mailing address is P.O. Box 215, Healdsburg, CA 95448.

[9] Remy Coeytaux, MD, PC, Statement of Information Corporation (attached as Ex. 5).

32. Defendant Abuzz, LLC is a Massachusetts limited liability company located at 125 Westgate Center Drive #1036, Hadley, MA 01035. Abuzz, LLC operates the domain abuzzhealth.com. Its resident agent is Registered Agents Inc., 82 Wendell Ave., Ste. 100, Pittsfield, MA 01201.

33. Defendant Manisha Kumar is a Massachusetts resident.

34. Defendant Ishani Village LLC is a Massachusetts limited liability company. Ishani Village LLC operates the domain ishanivillage.com. Its resident agent is Registered Agents Inc., 82 Wendell Ave., Ste. 100, Pittsfield, MA 01201.

35. Defendant Christie Pitney is a Maryland resident.

36. Defendant Christie Pitney Nursing and Reproductive Health Inc. (d/b/a Forward Midwifery, Nursing, and Reproductive Health) is a California corporation with its principal office located at 17879 Harbaugh Valley Rd., Sabillasville, MD 21780 and a California address of 100 Willow Plaza 400, Visalia, CA 93291. Forward Midwifery operates the domain forwardmidwifery.org. Defendant Christie Pitney is its chief executive officer, chief financial officer, and secretary, located at the same address. Its agent for service of process is Darryl W. Hitchman, 100 Willow Plaza 400, Visalia, CA 93291.

37. Defendant Forward Midwifery PLLC is a Washington, D.C. professional limited liability company.

38. Defendant Robin Tucker is a Maryland resident.

39. Defendant R. Tucker Limited (a/k/a R. Tucker Chartered) is a Washington, D.C. corporation that is registered as a foreign corporation in Maryland.[10] Defendant Tucker signed the Maryland incorporation document as president. Signing as owner of R. Tucker Limited, Defendant

[10] R. Tucker Limited (F22036503), Foreign Corporation Qualification (attached as Ex. 6).

Tucker also has secured the trade name "Metro Area Advanced Practice Healthcare" for R. Tucker Limited in Maryland. R. Tucker Limited's early principal office address was 4848 Battery Lane, Ste. 100, Bethesda, MD 20814. In May 2026, R. Tucker Limited changed its principal office address to its current resident agent's address: Registered Agents Inc., 306 W. Redwood St., Ste. 200, Baltimore, MD 21201.

40. Defendant Metro Area Modern Reproductive Care, LLC (d/b/a Roxy Clinic) is a Maryland limited liability company. Defendant Tucker was its original resident agent at 4848 Battery Lane, Ste. 100, Bethesda, MD 20814. Defendant Tucker also is its president. Its principal office address is its current resident agent's address: Registered Agents Inc., 306 W. Redwood St., Ste. 200, Baltimore, MD 21201.

41. Defendant Charlene Eisenberg Reproductive Health Collaborative, Inc. (a/k/a CE Repro, a/k/a CE Repro Fund) is a Maryland corporation and a 501(c)(3) organization. Defendant Tucker was CE Repro's original resident agent in Maryland. CE Repro obtained its tax-exempt status in 2023 via an Internal Revenue Service letter mailed to CE Repro in care of Defendant Tucker.[11] For tax year 2025, the Internal Revenue Service lists Defendant Tucker as CE Repro's principal officer at CE Repro's address: 10770 Columbia Pike, Ste. 1005, Silver Spring, MD 20901.[12] CE Repro's current resident agent is Registered Agents Inc., 306 W. Redwood St., Ste. 200, Baltimore, MD 21201.

42. Defendant Pea Conn LLC (d/b/a Southern Woven) is a Delaware limited liability company (incorporated in August 2025) that is registered in New York as a foreign limited liability company. Southern Woven owns and operates the website www.southernwoven.com. Southern

[11] Letter from Stephen A. Martin, Dir., Exempt Orgs. Rulings & Agreements, Internal Revenue Serv., to Charlene Eisenberg, Reproductive Health Collaborative Inc. (Mar. 7, 2023), perma.cc/PK9Z-9GVE (attached as Ex. 7).

[12] Charlene Eisenberg Reproductive Health Collaborative Inc., IRS (last visited Sept. 28, 2026), perma.cc/7BKA-ULYN (attached as Ex. 8).

Woven's agent for service of process on the Secretary of State is Registered Agents Inc., 418 Broadway Ste. R, Albany, NY 12207.

43. Defendant Southern Woven Health PLLC (a/k/a Woven Health Partners) is a Maine limited liability company. Its agent for service of process is Registered Agents Inc., 439 U.S. Route 1 Ste. A, York, ME 03909.

44. Defendant One Plus Four LLC (d/b/a We Take Care Of Us) is a California limited liability company formed in December 2025 with one manager: WTCOU LLC, 1209 Mountain Road Pl. NE, Ste. R, Albuquerque, NM 87110. One Plus Four LLC "own[s] and operate[s]" the domain wetakecareof.us.[13]

45. Defendant Robin Hewlett is a New Jersey resident.

46. Defendant CSA ASC LLC (d/b/a We Take Care Of Us) is a New Jersey limited liability company. Defendant Robin Hewlett is the member-owner of CSA ASC LLC.

47. Defendant Timothy Paik-Nicely is a California resident.

48. Defendant With Open Arms Center for Reproductive Choices, Inc. (d/b/a Choices Rising) is a California corporation. Defendant Timothy Paik-Nicely is the chief executive officer of this entity.

49. Defendant Jessica Nouhavandi is a California resident.

50. Defendant Brandon Nouhavandi is a California resident.

51. Defendant JBN Operations LLC is a California limited liability company operating as a mail-order pharmacy. Defendant Brandon Nouhavandi is the managing member of JBN Operations LLC.

[13] One Plus Four LLC, *We Take Care of Us Terms of Use* (last updated Apr. 1, 2026), perma.cc/LUX6-ECUQ (attached as Ex. 9).

52. Each individual defendant is sued both in his or her personal capacity as well as in his or her capacity as agent, employee, or volunteer for the Defendant entities with which the individual is affiliated.

## JURISDICTION AND VENUE

53. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff States' public nuisance claim arises under federal common law. *See, e.g.*, *Sam L. Majors Jewelers v. ABX, Inc.*, 117 F.3d 922, 926 (5th Cir. 1997) ("Federal jurisdiction exists if the claims in this case arise under federal common law." (citing *Illinois v. City of Milwaukee*, 406 U.S. 91, 100 (1972))); *accord Torres v. S. Peru Copper Corp.*, 113 F.3d 540, 543 (5th Cir. 1997); *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.*, 730 F.2d 186, 189 (5th Cir. 1984).

54. This Court also has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff States' claims necessarily raise substantial and disputed questions of federal law and constitutional order, including state sovereignty and self-governance. *See Grable & Sons Metal Prods., Inc. v. Darue Eng'g & Mfg.*, 545 U.S. 308, 314 (2005).

55. This Court has supplemental jurisdiction over Plaintiff States' state-law claims under 28 U.S.C. § 1367.

56. Venue is proper in this district under 28 U.S.C. § 1391(b)(2) because "a substantial part of the events or omissions giving rise to [Plaintiff States' claims] occurred," and are occurring, in this district. As detailed further below, each Defendant advertises the sale and shipment of abortion drugs in this district; engages in financial transactions regarding such drugs with individuals in this district; prescribes or prepares such drugs for delivery in this district; or dispenses, ships, or delivers such drugs in this district or to out-of-state individuals for delivery in this district. To take one example, Defendant Angel Foster of The MAP has posed in front of a map confirming that The MAP sends abortion drugs to Louisiana (including to Lake Charles specifically), as well as Arkansas and Alabama:

**Inside the legal fight over the telehealth clinics that help women defy abortion bans**

Massachusetts, Maine, Vermont, and Rhode Island are among some states that have shield laws with specific provisions protecting them from criminal prosecution or civil lawsuits even if the patient is in another state, according to nonprofit KFF.




Dr. Angel Foster, co-founder of Massachusetts Medication Abortion Access Project, points out on a map of the United States where her organization provides care, May 13, 2025, in Somerville, Mass. *AP Photo/Charles Krupa*

57. For the same reasons and those detailed below, the Court has personal jurisdiction over each Defendant.

**<u>FACTUAL ALLEGATIONS</u>**

**I. Plaintiff States Prohibit Abortion After *Dobbs*.**

58. In 2022, the Supreme Court "heed[ed] the Constitution and return[ed] the issue of abortion to the people's elected representatives." *Dobbs*, 597 U.S. at 232. In so doing, the Supreme Court recognized that the citizens of the several states would disagree over the proper approach to abortion. "In some States, voters may believe that the abortion right should be even more extensive than the right that [*Roe v. Wade*, 410 U.S. 113 (1973), and its progeny] recognized." *Id.* at 256. But "[v]oters in other States may wish to impose tight restrictions based on their belief that abortion destroys an 'unborn human being.'" *Id.* That inevitable disagreement is a feature, not a bug, of our

constitutional system—and nothing prevents "the people's elected representatives from deciding [each state for itself] how abortion should be regulated." *Id.*

59. In the wake of *Dobbs*, each Plaintiff State chose life, prohibiting abortion in all but the narrowest circumstances and specifically prohibiting the remote dispensing of abortion drugs in Plaintiff States.

60. Each Plaintiff State treats an unborn baby as fully human from the moment of conception. *See* La. R.S. § 14:2(A)(11) (defining "[u]nborn child" to mean "any individual of the human species from fertilization and implantation until birth"); La. R.S. § 22:1014(A)(4) ("It is the longstanding policy of this state that the unborn child is a human being from the time of conception and is, therefore, a legal person for purposes of the unborn child's right to life and is entitled to the right to life from conception under the laws and constitution of this state."); Ark. Const. amend. 68 § 2 ("The policy of Arkansas is to protect the life of every unborn child from conception until birth ...."); Ark. Code § 20-16-1503(6) (defining "[u]nborn child" as "the offspring of human beings from conception until birth"); Ala. Const. art. I, § 36.06(b) ("This state further acknowledges, declares, and affirms that it is the public policy of this state to ensure the protection of the rights of the unborn child in all manners and measures lawful and appropriate."); Ala. Code § 26-23H-3(7) ("A human being, specifically including an unborn child in utero at any stage of development, regardless of viability.").

61. Each Plaintiff State generally prohibits the abortion of an unborn baby except to save the life of the mother. *See* La. R.S. § 40:1061(C), (F) ("No person may knowingly" perform an abortion unless a licensed physician determines "in reasonable medical judgment" that abortion is necessary "to prevent the death or substantial risk of death due to a physical condition, or to prevent the serious, permanent impairment of a life-sustaining organ of a pregnant woman."); Ark. Code §§ 5-61-304(a), 5-61-404(a) ("A person shall not purposely perform or attempt to perform an abortion except to save

the life of a pregnant woman in a medical emergency."); Ala. Code § 26-23H-4(a), (b) ("It shall be unlawful for any person to intentionally perform or attempt to perform an abortion except" "if an attending physician licensed in Alabama determines that an abortion is necessary in order to prevent a serious health risk to the unborn child's mother.").

62. Each Plaintiff State likewise proscribes the sale and prescription of abortion drugs to terminate pregnancies. *See* La. R.S. § 40:1061(C) ("No person may knowingly administer to, prescribe for, or procure for, or sell to any pregnant woman any medicine, drug, or other substance with the specific intent of causing or abetting the termination of the life of an unborn human being."); La. R.S. § 14:87.9(A) ("Criminal abortion by means of an abortion-inducing drug is committed when a person knowingly causes an abortion to occur by means of delivering, dispensing, distributing, or providing a pregnant woman with an abortion drug."); Ark. Code §§ 5-61-303(1)(A), 5-61-403(1)(A) ("defining "[a]bortion" to include "the act of using, prescribing, administering, procuring, or selling of any ... medicine, drug, or any other substance, device, or means with the purpose to terminate the pregnancy of a woman, with knowledge that the termination by any of those means will with reasonable likelihood cause the death of the unborn child"); Ala. Code § 26-23H-3(1) (defining "abortion" to include the "prescription of any ... medicine, drug, or any other substance or device with the intent to terminate the pregnancy of a woman known to be pregnant with knowledge that the termination by those means will with reasonable likelihood cause the death of the unborn child"); Ala. Code § 13A-13-7 (punishing "[a]ny person who willfully administers to any pregnant woman any drug or substance ... to induce an abortion, miscarriage or premature delivery or aids, abets or prescribes for the same").

63. In the narrow circumstances where an abortion via abortion drugs is permitted, each Plaintiff State criminally prohibits the dispensing of abortion drugs without an in-person examination by a state-licensed physician. *See* Ark. Code § 20-16-1504(c) ("Before providing an abortion-inducing drug, the physician prescribing, administering, dispensing, or otherwise providing the abortion-

inducing drug shall ... [e]xamine the pregnant woman in person . . . ."); Ala. Code § 26-23E-7 ("[T]he physician giving, selling, dispensing, administering, or otherwise providing or prescribing the abortion-inducing drug must first examine the pregnant woman in person and document, in the woman's medical chart, the gestational age and intrauterine location of the pregnancy prior to giving, selling, dispensing, administering, or otherwise providing or prescribing the abortion-inducing drug."); *see also* La. R.S. §§ 1061.1.5(A), 1061.10 (requiring pre-abortion examination).

64. In those limited circumstances, the abortion drugs likewise must be administered in person with the prescribing physician. *See, e.g.*, La. R.S. § 40:1061.11(A) ("When any drug or chemical is used for the purpose of inducing an abortion, the physician who prescribed the drug or chemical shall be in the same room and in the physical presence of the pregnant woman when the drug or chemical is initially administered, dispensed, or otherwise provided to the pregnant woman."); Ark. Code § 20-16-603(b)(1) ("[T]he initial administration of the drug or chemical shall occur in the same room and in the physical presence of the physician who prescribed, dispensed, or otherwise provided the drug or chemical to the patient.").

65. On top of these broadly applicable laws, Louisiana and Arkansas have repeated in other statutes their prohibition of the sale, prescription, and delivery of abortion drugs within their borders. *See* La. R.S. § 962.2(A) ("Except as provided in R.S. 40:1061.11, no abortion-inducing drug may be sold, prescribed, dispensed, distributed, or delivered in this state in violation of this Section."); La. R.S. § 962.2(B) ("Notwithstanding any other provision of law to the contrary, delivery to a person in Louisiana by mail-order, courier, or as a result of a sale made via the internet in violation of this Section is strictly prohibited."); Ark. Code § 20-16-1504(b) ("It is unlawful for any manufacturer, supplier, physician, or any other person to provide any abortion-inducing drug via courier, delivery, or mail service."). Louisiana and Alabama also criminally prohibit abortion advertising, *i.e.*, "the placing

and carrying of any advertisement of abortion services by the publicizing of the availability of abortion services." La. R.S. § 14:87.4(A); *see* Ala. Code § 13A-4-1(a)(1).

## II. Defendants Effect a Cross-Border Scheme to Facilitate Abortion in Plaintiff States.

66. Notwithstanding the promise of *Dobbs*—and notwithstanding Plaintiff States' laws detailed above—abortions have proliferated by the thousands in Plaintiff States after *Dobbs*. According to one study considering data through December 2025, approximately 1,000 abortions occur in Louisiana every month; approximately 300 every month in Arkansas; and approximately 700 every month in Alabama.[14]

67. This is the direct and intended result of a nationwide scheme to force abortion into Plaintiff States.

68. This nationwide scheme has three essential components. *First*, the Biden Administration's 2023 decision to remove a longstanding in-person dispensing requirement for the abortion drug mifepristone, for the avowed purpose of allowing FDA-approved mifepristone to be illegally mailed from pro-abortion states into pro-life states. That unlawful decision is at issue in Louisiana's pending lawsuit against the U.S. Food and Drug Administration. *See Louisiana v. FDA*, No. 25-cv-1491 (W.D. La.). *Second*, the decisions of states like New York, California, and Massachusetts to enact so-called "shield laws," which purport to immunize residents of those states from liability for illegally sending abortion drugs into Plaintiff States. Those illegal shield laws are at issue in *Louisiana v. New York*, filed today as an original action in the United States Supreme Court. *Third*, the unilateral decisions of pharmacies, non-profit organizations, prescribers, and others to facilitate the flood of

[14] Society of Family Planning, #WeCount Report April 2022 to December 2025 (June 10, 2026), perma.cc/B4LV-KJXJ (attached as Ex. 10). Data for each state can be found by searching the individual state via the search bar, or by downloading the comprehensive report. Plaintiff States' graphs can be found in Exhibit 10.

abortion drugs into Plaintiff States and thereby "thwart draconian anti-abortion laws."[15] This lawsuit addresses those actors.

69. No single lawsuit can deliver complete relief to Plaintiff States—but each lawsuit can provide meaningful relief. And relief in each of these pending lawsuits will bring Plaintiff States extraordinarily close to complete relief. To realizing the promise of *Dobbs*: that each sovereign state may decide for itself "how abortion should be regulated." *Dobbs*, 597 U.S. at 256.

**A. Abortion Drug Manufacturers Encourage Abortions in Plaintiff States.**

70. This story begins with abortion drugs themselves. The abortion drug mifepristone causes an embryo or fetus to detach from the uterine lining, killing the embryo or fetus.[16] Mifepristone commonly is dispensed in conjunction with the drug misoprostol, which initiates contractions to expel the dead embryo or fetus. Misoprostol also can be used standing alone to effectuate an abortion—and some defendants in this case have threatened to switch to a misoprostol-only regimen if they lose the ability to mail mifepristone.[17] Accordingly, the terms "abortion drugs" and "abortion-inducing drugs" in this complaint refer to both drugs individually and together, as well as any other drug intended to cause an abortion.

71. Mifepristone can be foreign-made, but, as relevant here, FDA also has approved mifepristone manufactured by two American companies, Danco Laboratories, LLC and GenBioPro Inc.

72. Danco manufactures Mifeprex, which is the branded drug and appears in an orange box. Danco uses a company called Cencora, Inc. to distribute Mifeprex.

---

[15] Ex. 1 at 20.

[16] The term embryo and fetus refer to different stages of a human's development in the womb, similar to how the terms infant and toddler are used to refer to different stages of a human's development outside of the womb.

[17] Ex. 1 at 6–7, 10–11.




73. GenBioPro manufactures generic mifepristone, which appears in a blue-and-white box. GenBioPro uses a company called R&S Northeast, LLC to distribute generic mifepristone.




74. Both Danco[18] and GenBioPro[19] direct "patients" on their websites to INeedAnA.com—a website that promises to "help you learn about all your abortion options and find the most up to date information about abortion clinics, pills by mail, state abortion laws, and support."[20]

[18] Mifeprex, *How Do I Get Mifeprex?*, perma.cc/GVM8-PBSS (last visited Sept. 24, 2026) (attached as Ex. 11).

[19] GenBioPro, *About Medical Abortion*, perma.cc/PP3Y-GLXA (last visited Sept. 24, 2026) (attached as Ex. 12).

[20] I Need an A, *Find Verified Clinics, Pills by Mail, and Support*, perma.cc/RE5K-4FCU (last visited Sept. 24, 2026) (attached as Ex. 13).

75. I Need An A acknowledges that abortions in Plaintiff States are illegal. For example, as to Louisiana, I Need An A states that "[a]bortion is mostly banned in Louisiana" save for "very limited situations, such as to prevent a serious health risk to the [woman]."[21] I Need An A even emphasizes that "telehealth abortion is not permitted in Louisiana."[22] But I Need An A assures a reader that only a "provider[]" is subject to the ban, "not the [woman] having an abortion."[23]

### Current Louisiana Abortion Laws

**Abortion is mostly banned in Louisiana, but you still have options 💜**

Under Louisiana Revised Statutes § 40:1061.1.3, providers can only provide abortion care in very limited situations, such as to prevent a serious health risk to the pregnant person.

These laws apply to providers — not the person having an abortion. In fact, the law specifically says it cannot be used to punish the person who has an abortion. In simple terms, self-managed abortion is not a crime in Louisiana.

Here are other key pieces of legal context to consider when exploring your options in Louisiana:

- Abortion pills by mail are available in every state including Louisiana. Self-managed abortion is not a crime.
- Although telehealth abortion is not permitted in Louisiana, people can still order abortion pills online. Louisiana law does not criminalize taking abortion pills, but what the law says can be different than what happens in reality.

76. Having assured the website user they can lawfully obtain abortion drugs from providers who themselves are violating state law, I Need An A then offers abortion options at the zip code entered by the user.

77. So, for example, with a Lake Charles zip code, I Need An A tells a user: "Doctors have been banned from performing abortions in Louisiana in most cases, but you've still got options." Besides driving or flying to an out-of-state clinic, I Need An A proposes that the user "[o]rder abortion

---

[21] I Need an A, *Abortion Access Guide in Louisiana*, perma.cc/8SU5-T66M (last visited Sept. 24, 2026) (attached as Ex. 14).

[22] *Id.* at 2 (expand to see all state legal info).

[23] *Id.*

pills online"—although it "may come with legal risk." If a user clicks that option, I Need An A displays various websites hosted by organizations that advertise the prescription, sale, and shipment of abortion drugs in Plaintiff States (and every other state). Those are defendants in this case.



**B. Defendants Prescribe, Sell, and Dispense Abortion Drugs Within Plaintiff States.**

78. Although each organization's website is structured differently, each runs materially the same operation. Each operates a website specifically advertising abortion drugs for sale and shipment in Plaintiff States; each accepts payments from individuals in Plaintiff States for those drugs; and each ships the drugs to addresses in Plaintiff States.

**1. The Massachusetts Medication Abortion Project (The MAP)**

79. Start with The MAP. Run by Cambridge Reproductive Health Consultants, The MAP "believe[s] abortion care should be available and accessible to everyone."[24] The MAP acknowledges "abortion is illegal or restricted in some states," but promises "[d]octors and medical professionals in certain states where abortion is protected may prescribe abortion pills by mail, even if you live in a state where it is banned or restricted."[25]

80. To carry out that promise, The MAP "work[s] with doctors in Massachusetts to prescribe FDA-approved abortion medication to patients anywhere in the US who meet eligibility for the medications and apply through our website."[26] As of July 31, 2026, The MAP claimed to operate through "five prescribers."[27]

81. The process to obtain abortion drugs from The MAP is extraordinarily simple. The MAP asks for a zip code, birth date, and date of a last known period—and then confirms that "[y]ou are eligible for abortion pills from The MAP." So that a user may understand The MAP's promise to "discreetly" send abortion pills, The MAP offers more information explaining the process: (1) "You can order abortion pills online right now, shipped directly to all 50 states"; (2) it takes only "2-5

[24] Ex. 4.

[25] The MAP, *Frequently Asked Questions*, perma.cc/G8EU-9WL3 (last visited Sept. 24, 2026) ("Is abortion legal in the US?") (attached as Ex. 15).

[26] *Id.* ("How does The MAP work?") (attached as Ex. 16).

[27] Ex. 1 at 22.

minutes" "to give some basic information about you, your pregnancy, and your medical history," and "the price you pay is up to you"; (3) a doctor will "prescribe you pills" within "1-12 hours"; and (4) "[p]ills should arrive 1-5 days from the approval at the address you provide."





**Pills by Mail**

You can order abortion pills online right now, shipped directly to all 50 states.

**What you get**

We will connect you with a doctor who can figure out if abortion pills are right for you.

The pills you get in the mail are the same you would get in a clinic, are prescribed by a doctor, and packaged in a plain envelope.

**How does it work?**

1. **Complete the form**
   You will need to give some basic information about you, your pregnancy, and your medical history. Then, you'll add shipping and payment details. We use a pay-what-you-can model, meaning the price you pay is up to you.
   2-5 minutes
2. **Medical review**
   A doctor will look at the information you provided. If your pregnancy is under 80 days and abortion pills are safe for you to take, they will prescribe you pills.
   Within 1-12 hours
3. **Pills are shipped**
   Pills should arrive 1-5 days from the approval at the address you provide
   Delivery in 1-5 days

Your data is encrypted before it leaves your device and we use secure systems to help protect your personal health information. For more information, please read our Privacy Policy.

Order Pills by Mail

82. The user completes the order using a payment platform called Stripe that The MAP uses to bring in its profits.

83. Once the order is complete, it slots into an ongoing production process at The MAP. To carry out its mission, The MAP has "thousands and thousands"[28] of Mifeprex (manufactured by Danco and distributed by Cencora) and misoprostol (packaged by a California company called

[28] Ex. 1 at 2.

PharmPak, Inc.) pills. To fill orders, The MAP hosts "pill-packing parties [] fueled by pizza and wine," during which volunteers and others stuff packages (typically 500 per party) with Mifeprex and misoprostol. Those parties "are a little competitive," and The MAP has "a long waiting list of volunteers eager for a chance to help thwart draconian anti-abortion laws."[29]



84. Defendant Angel Foster created The MAP and even today runs "the famous MAP assembly line" at pill-packing parties, while also "be[ing] front and center" when "constantly fundraising."[30]

85. Defendant Susan Yanow is The MAP's director of community engagement who—as part of her role—"deploy[s] volunteers" to package abortion drugs.[31] Similarly, Defendant Maureen Paul—The MAP's medical director—oversees the medical side of the operation.

86. The MAP then ships those packages from Massachusetts to their destinations, including thousands shipped to addresses in each of Plaintiff States. The MAP claims to send "more

---

[29] *See* Ex. 1 at 2–3, 5, 6.

[30] *See id.*

[31] *Id.* at 7.

than 6,000" shipments every month, 95% of which go to states "where abortion is subject to harsh restrictions and near-total bans."[32]

87. Plaintiff States have confirmed through public-protection investigations that The MAP will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. The MAP never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did The MAP meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had The MAP spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, The MAP approved the requests and shipped the drugs. This includes specific shipments to Louisiana in June 2026 and Arkansas in April 2026.

[32] *Id.* at 2–3.




### 2. A Safe Choice Network/OPTIO

88. Where The MAP tries to mask its operations behind anonymous individuals all under the same MAP umbrella, other organizations use a complex web of corporate entities, prescribers, and pharmacies to carry out an identical scheme. That is well illustrated by Defendant Remy Coeytaux's California-based operation, which involves A Safe Choice Network and OPTIO.

89. A Safe Choice Network (asafechoicenetwork.com)[33] is another of the organizations identified by I Need An A (and thus by mifepristone-manufacturers Danco and GenBioPro).[34] A Safe Choice Network claims to be "a referral network of caring and experienced medical doctors who

[33] Defendant A Safe Choice Inc. plainly is related to Defendant A Safe Choice Network Inc.—and to the extent that any allegations here regarding A Safe Choice Network Inc. also (or only) apply to A Safe Choice Inc., Plaintiffs make the same allegations as to A Safe Choice Inc.

[34] A Safe Choice, *Medication Abortion. Discreetly Delivered.*, perma.cc/FRE3-CB7Y (last visited Sept. 24, 2026) (attached as Ex. 17).

provide safe, private, and effective medication abortions to women nationwide." A Safe Choice Network emphasizes that it ships abortion drugs "discreetly to all 50 states."




90. A Safe Choice Network tells website users that, to obtain abortion drugs, they need only "complete our quick, confidential, secure, HIPPA compliant online consultation form (no phone call required)" and pay $140. "After reviewing your information, a doctor in A Safe Choice network will send abortion pills (mifepristone and misoprostol) to you discreetly via Priority Mail. The package will not identify the contents."

91. A Safe Choice Network recognizes that "[t]he legal risk for having an abortion depend[s] on the state in which you live." Accordingly, for information on legal risks, A Safe Choice

Network directs[35] website users to a website called Plan C, which, in turn, links back to I Need An A's "expla[nation] [of] current Louisiana abortion laws" (and the laws of the other Plaintiff States).[36]

92. The connection between A Safe Choice Network and Plan C (and thus I Need An A) is no accident. Defendant Remy Coeytaux is the president and CEO of A Safe Choice Inc., as well as the incorporator of A Safe Choice Network Inc.[37] A family member, Francine Coeytaux, is a co-founder of Plan C.[38]

93. An "Order Now" button on A Safe Choice Network's website takes the user to another website associated with OPTIO Women's Health, which announces "Medication Abortion via Telehealth." In a blog post, A Safe Choice Network claims to "partner with Optio Women's Health, an online clinic operating under California's shield law."[39]

94. The OPTIO website copies much of the language verbatim from A Safe Choice Network's website, including, for example, the $140 price and the promise to send "a discreet envelope" with abortion drugs "everywhere in the United States."[40] The OPTIO website claims that "OPTIO is proud to be A Safe Choice network member," although it is obvious the two websites and corporations are one and the same. The OPTIO website also links articles, including one entitled "U.S. Clinicians Can Now Mail Abortion Pills to States Banning Abortion, Thanks to Shield Laws in Five

[35] A Safe Choice, *FAQs*, perma.cc/HKN6-G48A (last visited Sept. 24, 2026) ("Possible legal risks to you") (attached as Ex. 18).

[36] Plan C, *Comprehensive clinic and support finder*, perma.cc/4VXT-YYX3 (last visited Sept. 24, 2026) (attached as Ex. 19).

[37] A Safe Choice Network Inc., Statement of Information Corporation (attached as Ex. 20).

[38] Plan C Movie, *About*, perma.cc/5AV8-PBWJ (last visited Sept. 24, 2026) (attached as Ex. 21).

[39] A Safe Choice, *How Mississippi Residents Can Get Abortion Pills in 2026: 3 Private Paths* (June 26, 2026), perma.cc/AAJ8-Q54N (attached as Ex. 22).

[40] Optio Women's Health, *Medication Abortion via Telehealth*, perma.cc/KVL2-XBWQ (last visited Sept. 24, 2026) (attached as Ex. 23).

States."[41] It likewise directs users to the I Need An A website for "trusted information, support services, and guidance."[42]

95. An "Order Now" button on the OPTIO website promises a "simpl[e]" process involving brief information, a $140 payment ("billed as OPTIO WOMEN'S HEALTH"), and "[d]iscreet shipping via US Postal Service Priority Mail."[43] Payment is submitted via the payment platform Clover.




96. As promised, completion of the process results in the delivery of a GenBioPro mifepristone pack and a bottle of misoprostol pills. They arrive in a package with a return address for "OWH" (*i.e.*, OPTIO Women's Health) and P.O. Box 1259, Windsor, CA 95492. The labels are generated by a shipping-label company called Shippo.

---

[41] Optio Women's Health, *Support and Resources*, perma.cc/AC3Q-VLZR (last visited Sept. 24, 2026) (attached as Ex. 24).

[42] *Id.* at 1.

[43] Optio Women's Health, *Request Medication*, perma.cc/8BN5-QKH6 (last visited Sept. 24, 2026) (attached as Ex. 25).




97. The phone number that the A Safe Choice Network website lists for assistance is the same number the OPTIO website lists: (707) 710-8866. That phone number is tied to an account with RingCentral, a cloud-based communications system. Defendant Remy Coeytaux is responsible for that account. Both Coeytaux (through the address remyco@gmail.com) and the current chief executive officer of A Safe Choice Network Inc., Defendant Margaret Simeone (through the address megsimeone@proton.me), use that account.

98. Defendant Coeytaux also is behind the shipment of packages bearing the "OWH" return address. He has an account with Shippo—the shipping-label company that processes the OWH shipping labels—and he set that account up through another email address (coeytaux@proton.me). Using that account, he prepares and ships packages linked with the same return address that appears on those packages (OWH, P.O. Box 1259, Windsor, CA 95492), and the same email address that the OPTIO website lists for assistance (doctor@optiowomenshealth.com). Defendant Coeytaux pays approximately $11-12 in shipping costs for each such shipment.

99. The Coeytaux-run operation through A Safe Choice Network, OPTIO Women's Health, and Remy Coeytaux, MD, PC (d/b/a Choix ReproductiveHealth) unsurprisingly makes extraordinary sums of money from the enterprise. Coeytaux used a usual email address (remyco@gmail.com), his corporation Remy Coeytaux, MD, PC (d/b/a Choix ReproductiveHealth), and his signature as president of his corporation to open an account with the payment platform Clover, which facilitates his profits. Predictably, his average sale price is around $140 or $150—and his total sales are astonishing. By processing dozens to hundreds of abortion-drug packages per day, it was not uncommon for Coeytaux to clear tens of thousands of dollars a month in 2024. And that was just the start: In 2026, he has been responsible for hundreds of abortion-drug packages every month, resulting in over $100,000 in profits every month.

100. Coeytaux's operation and profits, moreover, are not limited to orders processed through A Safe Choice Network and OPTIO Women's Health. He also partners with another organization, Aid Access,[44] which likewise advertises abortions drugs in "all 50 U.S. states including Louisiana," Arkansas, and Alabama.[45] For orders that he fills through Aid Access—including transactions with individuals in Louisiana, as reflected in the picture below—he has been paid through a Venmo handle (@RemyCoeytaux) bearing the name of his corporation, Remy Coeytaux, MD, PC.

[44] Due to unique issues surrounding foreign service of process, Plaintiff States will soon file a separate lawsuit against Aid Access.

[45] Aid Access, *Get Abortion Pill Online in Louisiana · Order Here*, perma.cc/A2ZR-3XAB (last visited Sept. 24, 2026) (attached as Ex. 26).




101. A Safe Choice Network and OPTIO are responsible for quite literally hundreds of such packages mailed to addresses within each Plaintiff State. Although Plaintiffs do not yet know the full extent of these operations, A Safe Choice Network/OPTIO/Coeytaux at least mailed nearly 500 abortion-drug packages to Louisiana addresses between 2025 and mid-2026; over 200 abortion-drug packages to Arkansas addresses between 2025 and mid-2026; and over 500 abortion-drug packages to Alabama addresses between 2025 and mid-2026.

102. Plaintiff States have confirmed through public-protection investigations that A Safe Choice Network/OPTIO will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. A Safe Choice Network/OPTIO never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did A Safe Choice Network/OPTIO meaningfully verify that the person submitting the request was

the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had A Safe Choice Network/OPTIO spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, A Safe Choice Network/OPTIO approved the requests and shipped the drugs. This includes specific shipments to Louisiana in August 2026 and Arkansas in March 2026.

**3. Abuzz**

103. Abuzz, LLC—based in Massachusetts—takes a similar tack involving prescribers and entities in the Northeast.

104. Abuzz engages in a widespread marketing campaign on social media that tries to glamorize abortion drugs, making them appear safe, easy, and normal. For example, Abuzz posts memes lauding access to abortion drugs to everyone "regardless of a zip code." It also posts images placing abortion drugs alongside everyday items like sunglasses and wallets.



105. Through its website abuzzhealth.com, Abuzz advertises abortion drugs via "fast, discreet shipping."[46]




106. Abuzz characterizes the process for obtaining drugs as "simple, confidential, and designed to meet your needs."[47] A website user need only answer "a few basic questions," "mak[e] a payment," and then receive the drugs within "1-5 business days."[48] No phone or video call is required—"[e]verything is done through the intake form."[49]

107. Abuzz does not provide any in-person screening for known contraindications of abortion drugs, such as bleeding disorders, certain medications, IUDs, gestation age, and ectopic

---

[46] Abuzz, *Need abortion care at home?*, perma.cc/K2QF-GRAW (last visited Sept. 24, 2026) (attached as Ex. 27).
[47] Abuzz, *How it Works*, perma.cc/QYZ6-TUZ8 (last visited Sept. 24, 2026) (attached as Ex. 28).
[48] *Id.* at 1, 3.
[49] Abuzz, *FAQs*, perma.cc/JU3K-6VXR (last visited Sept. 24, 2026) (attached as Ex. 29).

pregnancy. To the contrary, Abuzz discourages women from receiving this type of care, stating that the need for an ultrasound is a "myth," that patients with IUDs do not need to take them out, and that blood tests (or knowledge of blood type) is not needed because patients with Rh-negative blood type do not need to worry about negative effects until after twelve weeks of pregnancy.[50]





**Can I use abortion pills if I have an IUD in place?**

It is very rare to become pregnant with an IUD in place. If you are pregnant with an IUD, there is a higher risk of it being an ectopic pregnancy. Ectopic pregnancies are dangerous because they can burst suddenly and cause severe internal bleeding. While an ultrasound is not required, it would show the location of the pregnancy and the IUD. You don't need to have the IUD taken out before taking abortion pills. They will still work (unless it is an ectopic pregnancy) and a risk is that the IUD may come out with the pregnancy. Since you have become pregnant, it also means you will need to have the IUD replaced after the abortion since it is no longer working correctly.

108. A "Get access today" button redirects the website user to an intake process. One of the first questions asks for a website user's state. If the user selects a state like New York, the website takes the user to questions about pregnancy status. But if the user selects a state like Louisiana, the website warns the user of "potential legal risks of getting abortion pills by mail in the state you selected."

[50] *See id.*

109. At the same step, the website links to third-party websites such as Plan C and Repro Legal Helpline for further information. Repro Legal Helpline carefully states that "using abortion pills to end your own pregnancy is not a crime in Louisiana" and also that "[h]ealthcare professionals in the state of Louisiana cannot provide abortions except to save the life or health of the pregnant [woman]"—by omission, Repro Legal Helpline concedes that the mailing of drugs itself is illegal.[51] The same is true of Plan C, which obliquely states that "[p]eople in Louisiana access abortion pills by mail from online clinics and providers outside of the state, despite laws that restrict in-state services."[52] Plan C also links to I Need An A, which, as explained above, expressly states that "telehealth abortion is not permitted in Louisiana."[53]

110. So long as the website user clicks through Abuzz's warning, a few questions and a few dollars (on the payment platform Square) later, abortion drugs—including GenBioPro mifepristone—are delivered to addresses in Plaintiff States.

111. Plaintiff States do not know every prescriber behind Abuzz, but they know of at least two: Defendant Christie Pitney and Defendant Manisha Kumar.

112. Pitney runs her own companies, Defendants Christie Pitney Nursing and Reproductive Health Inc. (d/b/a Forward Midwifery, Nursing, and Reproductive Health) and Forward Midwifery PLLC. Pitney also operates forwardmidwifery.org. Pitney and Forward Midwifery claim to offer mail-order abortion only "in California, Colorado, Maryland, Massachusetts, New Mexico, Oregon, & Washington."[54] That is not true. Pitney has an account with a shipping-label company called Pirate Ship—an account in her name and Forward Midwifery's name, using her

---

[51] Repro Legal Helpline, *Is abortion legal in Louisiana?*, perma.cc/EC2Z-AWJ2 (last visited Sept. 24, 2026) (attached as Ex. 30).

[52] Plan C, *Abortion pill access: Louisiana*, perma.cc/U2XR-GQG5 (last visited Sept. 24, 2026) (attached as Ex. 31).

[53] Ex. 14 at 2 (expand to see all state legal info).

[54] Forward Midwifery, *Promoting patient autonomy through empowering healthcare for all*, perma.cc/2E9Y-4MXF (last visited Sept. 24, 2026) (attached as Ex. 32).

Forward Midwifery address (christie@forwardmidwifery.com). Through that account, Pitney/Forward Midwifery prescribe and mail abortion drugs to addresses in Plaintiff States—on behalf of Abuzz and also as "an Aid Access provider" (the same organization with which Defendant Coeytaux is affiliated).[55] Pitney has confirmed that she has an "account[] with GenBioPro," which explains the GenBioPro drugs she is prescribing and mailing.[56]

113. On behalf of Abuzz, Pitney/Forward Midwifery are responsible for dozens of packages of abortion drugs mailed to addresses in each of Plaintiff States between 2024 and 2026.

114. Underscoring their work for Abuzz, Pitney/Forward Midwifery routinely use social media to amplify Abuzz content—such as this post proclaiming that "[a]bortion pills are SAFE, EFFECTIVE, and AVAILABLE in all 50 states!"

---

[55] Carrie N. Baker, *Online Abortion Provider Christie Pitney of Forward Midwifery: "Fast, Convenient Care"*, Ms. Magazine (Jan. 28, 2022) perma.cc/P7DM-EXCG (attached as Ex. 33).

[56] *Id.* at 13.




115. Defendant Kumar and her company Defendant Ishani Village carry out the same mission under Abuzz, using the same shipping-label company, Pirate Ship, that Pitney uses to mass mail abortion drugs. Both based in Massachusetts, Kumar/Ishani Village use Massachusetts' Address Confidentiality Program (ACP), which allows users to hide their addresses behind P.O. Box 9120, Chelsea, MA 02150.[57] In some instances (or at least some instances in the past), Kumar/Ishani Village disclose their identity despite using the ACP address.

[57] Address Confidentiality Program Fact Sheet (attached as Ex. 34).




116. Kumar/Ishani Village also, however, use the more-cryptic initials "IV" (*i.e.*, Ishani Village) when hiding behind the ACP while sending drugs for Abuzz.




117. Here, too, although Plaintiff States do not yet know the full extent of these operations, on behalf of Abuzz, Manisha Kumar and Ishani Village sent at least more than 1,300 abortion-drug packages to Louisiana addresses between 2024 and mid-2026; over 2,700 abortion-drug packages to Arkansas addresses between 2024 and mid-2026; and over 900 abortion-drug packages to Alabama addresses in fewer than 12 months spanning 2025 and mid-2026.

118. Plaintiff States have confirmed through public-protection investigations that Abuzz and its agents will send, and have sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. Abuzz never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did Abuzz meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had Abuzz spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, Abuzz approved the requests and shipped the drugs. This includes a specific shipment to Arkansas in February 2026 from Kumar/Ishani Village (and their hidden address).



**4. Southern Woven**

119. A web of Southern Woven entities and actors follows a similar pattern. The central piece is Defendant Robin Tucker. Tucker is a nurse practitioner and certified nurse midwife who lives and works in Maryland and Washington, D.C. She worked and, on information and belief, continues to work as a prescriber for the same organization associated with Defendants Remy Coeytaux and Christie Pitney (Aid Access), as well as the same organization associated with Defendants Manisha Kumar and Christie Pitney (Abuzz).[58] But more recently, she has created Southern Woven, which claims to be "southern" and which exclusively sells abortion drugs to individuals in pro-life states where abortion is prohibited.

120. Southern Woven's story rests on Tucker's entities—Defendants R. Tucker Limited, Metro Area Modern Reproductive Care, LLC (d/b/a Roxy Clinic),[59] and CE Repro (the 501(c)(3) organization). Through these entities, Tucker publicly purports to provide abortion drugs by mail only in states where abortion is lawful.[60] She does so through the same shipping-label company used by Pitney and Kumar—Pirate Ship—with an account registered in her name and Metro Area's name. Tucker typically generates labels with the same return address: MA (*i.e.*, Metro Area), P.O. Box 29, Cabin John, MD 20818.

121. The filing party that created Tucker's Metro Area entity (in May 2022) was the same Plano, Texas attorney (Heidi Kocher of a law firm called Liles Parker[61]) who created Christie Pitney's Forward Midwifery PLLC entity (in April 2022).[62] In addition, Pitney/Forward Midwifery use the

---

[58] Carrie N. Baker, *Online Abortion Provider Robin Tucker: 'I'm Trying To Remove Barriers…. It Feels Great To Be Able To Help People This Way"*, Ms. Magazine (Jan. 4, 2022), perma.cc/WBE7-7RXS (attached as Ex. 35).

[59] Roxy Clinic, *About*, perma.cc/TFS6-ZC36 (last visited Sept. 25, 2026) (attached as Ex. 36).

[60] Mara Gordon, *With Telehealth Abortion, Doctors Have to Learn to Trust and Empower Patients*, NPR (Jan. 17, 2023), perma.cc/P6DP-ZN6F (attached as Ex. 37).

[61] Liles Parker, *Heidi Kocher*, perma.cc/RE47-6TV2 (last visited Sept. 25, 2026) (attached as Ex. 38).

[62] Forward Midwifery PLLC, Articles of Organization for Domestic Limited Liability Company (attached as Ex. 39).

address 1331 H St. NW, Washington, D.C. 20005—the same address Tucker has used as an origin address and a return address for her shipments. These shared operational details reinforce that Tucker is not an isolated actor but part of a broader, coordinated network facilitating the sale and shipment of abortion drugs.

122. Despite her public representations, Tucker has repeatedly sent abortion drugs to addresses in states where such mailing is unlawful (including Louisiana and Arkansas) via the same shipping account—*i.e.*, in her name, in Metro Area's name, with a Pirate Ship label, and with the MA, P.O. Box 29, Cabin John, MD 20818 return address. She did so in 2023, 2024, and 2025. Tucker claims that Metro Area's providers "are licensed in each state we serve."[63] On information and belief, neither Tucker nor any agent of Metro Area is licensed in Louisiana and Arkansas.

123. In an apparent effort to cover up mailing abortion drugs to states where abortion is unlawful, Tucker tried to set up a shadow system in 2025: Southern Woven—a Delaware company registered to do business in New York, but really operating out of Maryland and Washington, D.C.

124. Tucker runs social media accounts for both Southern Woven and Metro Area (d/b/a Roxy Clinic) that publish the same content on the same days, which often appears to be AI-generated (as Southern Woven's website acknowledges):[64]

---

[63] Ex. 36.

[64] Southern Woven, *Medical Review and Clinical Standards*, perma.cc/B2X6-CWRS (last visited Sept. 25, 2026) (attached as Ex. 40).


We're still here.
roxyclinic.com
roxy.clinic • Follow
roxy.clinic Quick update on care at Roxy.
We're staying open. We're continuing to serve patients. We're evaluating possible small adjustments to the regimen — more as we know more.
What hasn't changed:
- Online consult. from your couch
- Discreet delivery in plain packaging
- Sliding scale starts at $0
- Medical support throughout the process
- Care through 13 weeks
If you've got a consult started or were planning to, your care continues.
More on the blog as the situation evolves — link in bio.
#medicationabortion #telehealth #reproductivehealth #abortionpills #abortionaccess #abortioncare #telemedicine #reproductivejustice
19w
3 likes
May 1
Add a comment...
Post




125. Southern Woven's website claims to provide "Safe Abortion pill access For Southerners By Southerners."[65] According to the website, Southern Woven "was built" for "[t]he states with the most restrictive abortion laws."[66] "Telehealth is the way we do that. Mail is the way we do that." "Serving the South," Southern Woven promises, with "[s]afe and discreet delivery to your door."[67] "Our Mission," Southern Woven emphasizes, is "expand[ed] access to medication abortion in the South by connecting people with licensed telehealth clinicians."[68]

[65] Southern Woven, *Get the Abortion Pill Online*, perma.cc/X8GJ-XFKP (last visited Sept. 25, 2026) (attached as Ex. 41).

[66] Southern Woven, *For Southerners, By Southerners*, perma.cc/3HHL-ZUH4 (last visited Sept. 25, 2026) (attached as Ex. 42, at 3).

[67] Southern Woven, *Get the Abortion Pill Online*, *supra* n.65 (attached as Ex. 43).

[68] Southern Woven, *Support Abortion Access*, perma.cc/8S8S-6VGE (last visited Sept. 25, 2026) (attached as Ex. 44).

126. "Clinical care at Southern Woven is overseen by a Certified Nurse Midwife with more than a dozen state licenses and clinical experience going back to 2010 across labor and delivery, women's health, and complex gynecology"—*i.e.*, Robin Tucker.[69] And the process is much the same as with other schemes detailed above. According to Southern Woven, "[t]he model is simple on purpose: someone fills out a confidential intake," then "a licensed clinician reviews it," and then "FDA-approved medications are mailed in discreet packaging."[70] All for a sliding-scale fee between "$0 to $145" depending on a user's ability to pay.[71]

127. Southern Woven touts its status as "a referral partner of some of the most trusted organizations in the reproductive health space," including I Need An A.[72] Southern Woven also is open and "honest" about the illegality of its conduct: "We do **not** claim that accessing care through telemedicine is 'legal' in every state. What we say is that people across all 50 states are safely accessing care, and that shield laws protect the providers who prescribe."[73]

128. Payments for abortion drugs processed by Southern Woven's website—including payments for drugs mailed into Plaintiff States—are routed through a separate entity, Defendant Southern Woven Health PLLC (a/k/a Woven Health Partners), which is a Maine limited liability company.

129. Southern Woven is inextricably intertwined with Tucker's Metro Area entity—as well as Defendant CE Repro, Tucker's 501(c)(3) funding Southern Woven.

130. Southern Woven solicits donations on its website through CE Repro: "We partner with CE Repro Fund, our fiscal sponsor, to process donations securely and transparently. CE Repro

---

[69] Ex. 42 at 6.

[70] *Id.* at 4.

[71] *Id.* at 5.

[72] Southern Woven Medical Team, *Is Southern Woven Legit? Here's What You Should Know*, Southern Woven (Apr. 10, 2026), perma.cc/M4E7-K4BH (attached as Ex. 45, at 2).

[73] *Id.* at 4.

Fund is a 501(c)(3) nonprofit organization."[74] The website confirms that "100% of your donation goes directly to supporting abortion access through Southern Woven."[75] And it directs users to "[c]lick the button below to make a secure donation through our fiscal sponsor, CE Repro Fund."[76] When clicked, that button takes the user to a third-party donation website that states (a) it is "[o]rganized by CE Repro Fund" (identifying CE Repro's EIN number), (b) it is "[p]owered by the CE Repro Fund (a licensed 501(c)(3) nonprofit)," and (c) "CE Repro is a funding partner who ensures that your donation goes to Southern Woven, while still allowing you to make a tax deductible donation."[77]


**Southern Woven Healthcare**

**Donate to Southern Woven**

**Powered by the CE Repro Fund (a licensed 501(c)(3) nonprofit)**

**Why Southern Woven?**

Southern Woven is a community-driven organization that creates safe, dignified pathways for people in the South to access essential reproductive health services and related counseling. By weaving together local clinics, tele-medicine providers, and grassroots outreach, Southern Woven ensures that:

- **Everyone gets timely, confidential care,** even if they live in an area where care is difficult to access.
- **Financial barriers are lowered** through a sliding-scale model that covers medication, clinical support, and after-care.

Your contribution helps keep that safety net intact.

CE Repro is a funding partner who ensures that your donation goes to Southern Woven, while still allowing you to make a tax deductible donation.

Show less

Verified
Organized by CE Repro Fund
501(c)(3) Public Charity · EIN 92-0309271
hello@cerepro.org

131. Southern Woven also is using the same shipping scheme that Tucker built under Metro Area. It has mailed and is mailing abortion drugs—including GenBioPro mifepristone—to addresses in Plaintiff States via the same Pirate Ship shipping-label account and bearing the same familiar return address: MA, P.O. Box 29, Cabin John, MD 20818.

---

[74] Ex. 44.

[75] *Id.*

[76] *Id.*

[77] CE Repro Fund, *Southern Woven Healthcare*, Givebutter, perma.cc/244M-CVPB (last visited Sept. 25, 2026) (attached as Ex. 46).




132. Plaintiff States have confirmed through public-protection investigations that Southern Woven will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. Southern Woven never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did Southern Woven meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had Southern Woven spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, Southern Woven approved the requests and shipped the drugs. This includes specific shipments to Louisiana and Arkansas in August 2026.

### 5. We Take Care Of Us

133. Defendants One Plus Four LLC, CSA ASC LLC, and Robin Hewlett similarly operate under the name We Take Care Of Us (at the domain wetakecareof.us). We Take Care Of Us's website

originally listed CSA ASC LLC as its owner—and Hewlett, a midwife in New Jersey, owns and operates CSA ASC LLC. More recently, however, We Take Care Of Us's website lists One Plus Four LLC as its owner. Because the unlawful conduct by We Take Care Of Us alleged in this complaint spans both periods of alleged ownership, Hewlett is a named Defendant alongside both CSA ASC LLC and One Plus Four LLC.

134. We Take Care Of Us advertises abortion drugs "in all 50 states" and emphasizes that "[w]e provide care in all U.S. states."[78]




135. We Take Care Of Us warns that "[t]he legal context of abortion care is different in every state," and so directs website users to the Repro Legal Helpline website. As discussed above, Repro Legal Helpline states that, in Louisiana (and the other Plaintiff States), "[h]ealthcare professionals in the state of Louisiana cannot provide abortions except to save the life or health of

[78] We Take Care of Us, *Abortion Care*, perma.cc/7RCH-2ZVX (last visited Sept. 25, 2026) (attached as Ex. 47).

the pregnant [woman]."[79] The website also links to I Need An A's website, which states that "telehealth abortion is not permitted in Louisiana."[80]

136. We Take Care Of Us claims that "Certified Nurse Midwives" facilitate the organization's abortion drug scheme.[81]

137. The "Start Here" button on We Take Care Of Us's website takes the website user to a brief questionnaire that "should take about 5-7 minutes to complete."[82] The user must first answer the questions to determine "if you are eligible for care with one of our affiliated U.S. licensed providers."[83] "If you are eligible and you wish to continue," We Take Care Of Us will then collect the user's name, shipping address, and payment.[84] No video or telephone call is required—website users need only complete the online intake form.

138. Unlike with the MAP, A Safe Choice Network/OPTIO, Abuzz, and Southern Woven operations, We Take Care Of Us works through a mail-order pharmacy—the same pharmacy used by Aid Access, the organization affiliated with Coeytaux, Pitney, and Tucker. *See supra* ¶¶ 100, 112, 119. Once an unknown prescriber behind We Take Care Of Us receives payment, therefore, the prescriber sends the prescription to the mail-order pharmacy, which then directly mails the abortion drugs (GenBioPro mifepristone) into Plaintiff States. Those packages nearly always come through FedEx.

139. Plaintiff States have confirmed through public-protection investigations that We Take Care Of Us will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. We Take Care Of Us never conducted a telehealth

---

[79] Ex. 30.

[80] Ex. 14 at 2 (expand to see all state legal info).

[81] We Take Care of Us, *Frequently Asked Questions*, perma.cc/67C5-4KV9 (last visited Sept. 25, 2026) ("Who are the providers?") (attached as Ex. 48).

[82] We Take Care of Us, *Medical Request Form*, perma.cc/XQZ9-PDR4 (last visited Sept. 25, 2026) (attached as Ex. 49).

[83] *Id.*

[84] *Id.*

consultation or otherwise spoke with the person identified as the patient. Nor did We Take Care Of Us meaningfully verify that the person submitting the request was the person identified as the patient. The name associated with the payment method did not match the identified patient, and the billing address did not match the shipping address. Had We Take Care of Us spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, We Take Care Of Us approved the requests and shipped the drugs. This includes specific shipments to Louisiana in June 2026 and Arkansas in August 2025.




### 6. Choices Rising

140. For all practical purposes, With Open Arms Center for Reproductive Choices, Inc. (d/b/a Choices Rising)—created by Defendant Anthony Paik-Nicely—operates materially identically to how We Take Care Of Us operates.

141. Choices Rising's website (choicesrising.com) advertises "abortion pills by mail to 50 US states."




142. Choices Rising states that only "4 Easy Steps" are necessary to secure "convenient and discreet abortion pills delivered by mail": (1) complete a request form and provide requested information (including payment via Stripe); (2) sign consent forms; (3) receive Choices Rising's approval that "you have been medically cleared to receive the service"; and (4) receive abortion drugs by mail "within 3-5 days" "in an unmarked box."[85] No video or telephone call is necessary.

[85] Choices Rising, *Choices Rising Abortion Pill Virtual Clinic*, perma.cc/W3BN-HJ7Y (last visited Sept. 25, 2026) (attached as Ex. 50).

143. Choices Rising claims to have a "small team" of "board-certified physicians and [a] registered nurse"—presumably including Defendant Paik-Nicely—that "provid[es] access to the FDA-approved medications for safe in-home abortion treatment."[86]

144. Choices Rising also tells website users to visit I Need An A's website "[t]o find out more about what is legal in your state."[87] Choices Rising likewise directs website users to The Guttmacher Institute, whose website states that "[a]bortion is completely banned with very limited exceptions" in Louisiana—and "[m]edication abortion can only be provided after in-person visit because state requires pills to be dispensed in person."[88]

145. Through its website and people like Paik-Nicely, Choices Rising sends prescriptions for mail abortion drugs (including GenBioPro mifepristone) to the same mail-order pharmacy used by We Take Care Of Us and Aid Access. The mail-order pharmacy has then sent abortion drugs to addresses in each Plaintiff State, including (in Louisiana) addresses in Abbeville, Baton Rouge, Breaux Bridge, and Cheneyville.

146. Plaintiff States have confirmed through public-protection investigations that Choices Rising will send, and has sent, abortion drugs to addresses in Plaintiff States based on entirely fabricated pregnancy and patient information. Choices Rising never conducted a telehealth consultation or otherwise spoke with the person identified as the patient. Nor did Choices Rising meaningfully verify that the person submitting the request was the person identified as the patient. The identification submitted depicted a woman, but the person completing the process was, in fact, a man. The name associated with the payment method did not match the identified patient, and the

[86] Choices Rising, *About Us*, perma.cc/N77J-SSKE (last visited Sept. 25, 2026) (attached as Ex. 51).

[87] Choices Rising, *FAQs*, perma.cc/6RR4-UJXX (last visited Sept. 25, 2026) ("How will state specific laws affect my pregnancy options?") (attached as Ex. 52).

[88] Guttmacher, *Interactive Map: US Abortion Policies – Louisiana*, perma.cc/UA35-RWZR (last visited Sept. 25, 2026) (attached as Ex. 53).

billing address did not match the shipping address. Had Choices Rising spoken with the identified patient or meaningfully attempted to verify her identity, it would have discovered that she did not exist and that the information submitted through its screening process was false. Instead, Choices Rising approved the requests and shipped the drugs. This includes a specific shipment to Arkansas in March 2026.




### C. Mail-Order Pharmacies and Common Carriers Facilitate This Scheme.

147. For Defendants We Take Care of Us and Choices Rising (and for the related organization, Aid Access), their operations would not work if they did not have a mail-order pharmacy to which their prescribers could send prescriptions for priority mailing to addresses in Plaintiff States. Those pharmacies thus are indispensable to the interstate mail-order abortion scheme. Relevant here

are Honeybee Health Inc., a Delaware corporation based in California, and its shadow corporation, Defendant JBN Operations—which is behind We Take Care of Us, Choices Rising, and Aid Access.

148. Honeybee Health Inc. is an online pharmacy founded by Defendant Jessica Nouhavandi. During the COVID-19 pandemic, Nouhavandi and Honeybee seized the opportunity to use Honeybee as a vehicle for mail-order abortion drugs. According to Francine Coeytaux, it was Honeybee and Nouhavandi who were "the first to actually look at the restrictions and say, 'Hey wait a minute, they don't mention anything about mailing.'"[89] "She (Nouhavandi) stepped up and starting doing this," says Coeytaux.[90] "By mid-2021," Honeybee was making millions of dollars off of mail-order abortion drugs.[91] As Nouhavandi has put it, "[w]e're really the main hub for mailing abortion pills.... Almost everything comes out of California, and mainly from Honeybee."[92] In fact, Choices Rising has gone so far as to list Honeybee Health as one of its partners.

149. Honeybee recently has filed a court brief claiming that "Honeybee dispenses the highest volume of mifepristone by mail of any U.S. mail-order pharmacy."[93] Honeybee qualified that statement by also saying that "Honeybee only dispenses mifepristone by mail in jurisdictions whose laws permit it to do so (currently thirty-one states and the District of Columbia) and does not ship mifepristone to Louisiana."[94]

150. Honeybee and Nouhavandi's word choice is significant because, although they have attempted to protect Honeybee itself from the consequences of mailing abortion drugs to pro-life

[89] James Brock, *Abortion Activists*, Los Angeles Business Journal (July 10, 2023), perma.cc/H88X-QGZT (attached as Ex. 54, at 2).

[90] *Id.*

[91] *Id.*

[92] Patrick Adams, *Abortion drugs: Bill would allow doctors to prescribe anonymously*, LAist (Sept. 10, 2025), perma.cc/S9PH-ARAC (attached as Ex. 55, at 4).

[93] Br. of Amicus Curiae Honeybee Health, Inc. In Support Of Applications By Danco And GenBioPro To Stay Or Vacate The Fifth Circuit's Stay Pending Appeal, Danco Lab'ys, L.L.C. v. Louisiana, No. 25A1207, at 1 (May 7, 2026), perma.cc/R6FG-NABP (attached as Ex. 56, at 1).

[94] *Id.*

states in violation of state laws ("we don't want to jeopardize our licenses to sell [ordinary medications that have nothing to do with abortions] in those states," says Nouhavandi[95]), Nouhavandi formed a shadow company with her brother Defendant Brandon Nouhavandi to carry out that illegal activity.

151. That company is Defendant JBN Operations LLC—*i.e.*, **J**essica and **B**randon **N**ouhavandi Operations LLC. JBN is a pharmacy business located at 3751 S. Hill St., Los Angeles, CA 90007. Brandon Nouhavandi—who was and, on information and belief, continues to be a Honeybee employee—is a manager or member of JBN. JBN's California pharmacy license expired in 2026—yet JBN has continued to ship abortion drugs to each of Plaintiff States after that expiration.

152. The idea behind JBN—"a U.S. pharmacy in a state with a shield law [that] would fill the orders, cutting delivery times"—came from Aid Access prescribers looking for a way to facilitate mailing abortion drugs into "red states."[96] It also came from Jessica Nouhavandi who told The New York Times Magazine that "she was exploring setting up a legally separate pharmacy in Massachusetts so that her company [Honeybee] could also take advantage of the state's shield law."[97] She ultimately did not have to move across the country because, after California passed its own shield law, she and her brother, Brandon, created JBN in California.

153. JBN is the lifeline for We Take Care of Us, Choices Rising, and Aid Access. When individuals in Plaintiff States accept their offer to sell abortion drugs, the corporations and prescribers behind those websites transmit the prescriptions to JBN. JBN then fills those prescriptions and ships the abortion drugs from California to the addresses in the Plaintiff State.

154. Although Plaintiff States do not yet know how many abortion-drug packages JBN has sent into each Plaintiff State, public reports suggest that Honeybee and JBN are responsible—through

---

[95] Ex. 54 at 3.

[96] Emily Bazelon, *The Doctors Risking Everything to Offer Abortions Across State Lines*, The New York Times Magazine (Oct. 4, 2022) (attached as Ex. 57).

[97] *Id.*

Aid Access alone—for "12,000 pills a month to people all over the country."[98] And on information and belief, JBN has shipped thousands of abortion-drug packages to each of Plaintiff States over the past three years.

155. JBN continues to ship abortion drugs to each of Plaintiff States today. That includes a specific shipment to Louisiana in June 2026. JBN's packages uniformly bear JBN's return address: 3751 S. Hill St., Los Angeles, CA 90007.




156. JBN's role in this scheme leads to the related role of common carriers themselves.

157. FedEx Corporation is responsible for approximately half of the scheme. Jessica and Brandon Nouhavandi—through JBN Operations LLC—have been FedEx customers since March 2024. FedEx has assigned a customer number to JBN Operations LLC (#200669519). It has logged

[98] Ex. 55 at 6.

JBN's return address as 3751 S. Hill St., Los Angeles, CA 90007. And it lists Brandon Nouhavandi as JBN's primary shipper contact. FedEx also tracks each of JBN's shipments into each of Plaintiff States.

158. FedEx has its own label-generating service, which appears to be what JBN uses in shipping thousands of abortion drugs into each of Plaintiff States on behalf of We Take Care of Us, Choices Rising, and Aid Access (and perhaps other unknown entities and individuals).




159. For its part, USPS is responsible for the remainder of the interstate mail-order abortion scheme. It has delivered, and continues to deliver, thousands of abortion drugs to addresses in Plaintiff States on behalf of The MAP, A Safe Choice Network/OPTIO, Abuzz, and Southern Woven.

160. USPS's responsibility for The MAP, in particular, is most egregious. Not only does USPS handle 100% of the shipments from The MAP into Plaintiff States, but USPS also creates—through an account(s) held by an agent(s) of The MAP—the shipping labels enabling the mass

shipment of the abortion drugs. USPS knows that The MAP is responsible for the shipments both because The MAP has a registered account and because the labels themselves expressly identify The MAP by name and by its return address:




161. The MAP is extraordinarily open about this scheme, centering USPS in almost every picture showcasing its operation to the media.


e about The MAP









MAP volunteers haul bins of packaged abortion pills to a nearby post office. Emily Schiffer




A typical daily run to the nearby post office includes hundreds of packages bound for all 50 states. Emily Schiffer

**III. Defendants Actively Misrepresent Key Facts Surrounding Abortion Drugs.**

162. One key theme across Defendants' websites is a blatant disregard for the truth and women and girls' safety. That includes frivolous claims such as A Safe Choice Network's claim to be "[a] woman-owned business" (when the whole operation is run by Remy Coeytaux).[99] It includes the frivolous claim by Robin Tucker (a Maryland resident) that Southern Woven is "For Southerners By Southerners."[100] And it includes the frivolous claims by Tucker and Christie Pitney that their businesses (Metro Area and Forward Midwifery) mail abortion drugs only to states where abortion is legal.

163. Beyond those frivolous claims, there are six general buckets of misleading claims appearing across all websites.

164. *First*, Defendants mislead consumers by suggesting medication abortion in Plaintiff States is lawful. They do so by emphasizing that self-administered abortion by a pregnant woman in a Plaintiff State is *not* a crime—but they omit that the act of dispensing abortion drugs by mail in each Plaintiff State *is* a crime. For example:

- The MAP claims that "[d]octors and medical professionals in certain states where abortion is protected may prescribe abortion pills by mail, even if you live in a state where it is banned or restricted."[101]
- A Safe Choice Network/OPTIO claims[102] Plaintiff States' laws "expressly exempt[] the pregnant [woman] from prosecution" and individuals in such states may lawfully obtain abortion drugs: "Because in-state access is nonexistent, many Mississippians [and those in Plaintiff States] now rely on telehealth providers based

[99] A Safe Choice, *About Us*, perma.cc/JV9T-3G69 (last visited Sept. 26, 2026) (attached as Ex. 58).
[100] *See* Ex. 42.
[101] Ex. 15.
[102] Ex. 22.

in states with shield laws. These laws protect doctors who prescribe and mail abortion pills to people in Mississippi and other restricted states. It is a proven, legal pathway that thousands of people use every year to get abortion pills in Mississippi and other banned states."

- We Take Care Of Us claims: "There are no laws directly criminalizing the ingestion of abortion pills in any state . . . ."[103]

165. Defendants Tucker/Southern Woven concede the misleading nature of the statements above: "We do **not** claim that accessing care through telemedicine is 'legal' in every state. What we say is that people across all 50 states are safely accessing care, and that shield laws protect the providers who prescribe."[104] But even that concession elides the fact that their conduct *is illegal* in Plaintiff States.

166. *Second*, Defendants mislead consumers by overstating the safety, and understating the risks and effects, of abortion drugs. For example:

- A Safe Choice Network/OPTIO claims that "[s]erious complications (such as infection requiring hospitalization or blood transfusion) occur in about 0.2% of cases."[105]

- Abuzz claims that abortion drugs "are very safe—safer than Tylenol and safer than driving in a car! The risk of severe, life-threatening complications requiring hospitalization is less than 1%."[106]

---

[103] We Take Care of Us, *Frequently Asked Questions*, perma.cc/67C5-4KV9 *supra* n.81 ("Is it legal to take abortion pills where I live?") (attached as Ex. 59).

[104] Ex. 45 at 4.

[105] A Safe Choice, *Living in Alabama and Safely Ordering Abortion Pills Online* (Nov. 13, 2025), perma.cc/ZDL3-8C6X (attached as Ex. 60).

[106] Ex. 29 at 2.

- Southern Woven claims abortions are "[e]xtremely safe" ("[s]afer than Tylenol, wisdom teeth removal, and childbirth"), that "[s]erious complications occur in less than 0.4% of cases," and that "[l]ess than 1% need to visit an ER."[107]
- We Take Care Of Us claims "[m]edication abortion is extremely safe. For every 100 people, about 99 will have a completely uncomplicated experience. Abortion medications have a better safety record than many common over-the-counter medications, including Tylenol."[108]
- Choices Rising claims abortion via medication "is one of the SAFEST medical procedures," that "[c]omplications occur in less than 0.4% of patients," and "[c]omplications are rare and most are not serious."[109]



[110]

167. Those representations squarely contradict FDA's own representations. The FDA-approved label states that up to 4.6% of women who take mifepristone for pregnancies under ten

[107] Southern Woven, *Frequently Asked Questions About Abortion Pills & Our Services*, perma.cc/UPF4-2RMF (last visited Sept. 26, 2026) ("Are abortion pills safe?") (attached as Ex. 61).

[108] We Take Care of Us, *Frequently Asked Questions*, *supra* n.81 ("Is Medication abortion safe?") (attached as Ex. 62).

[109] Choices Rising, *Abortion Pill (Medicated Abortion)*, perma.cc/R758-JTH2 (last visited Sept. 26, 2026) (attached as Ex. 63).

[110] We Take Care of Us, Post on Instagram (Sept. 20, 2024), perma.cc/ZF63-8BYH (attached as Ex. 64).

weeks experience serious adverse events requiring emergency room care.[111] The label states that "[a]bout 2 to 7 out of 100 women taking [mifepristone] will need a surgical procedure because the pregnancy did not completely pass from the uterus or to stop bleeding."[112] In fact, 8% of women may bleed for more than 30 days.[113] So severe are these risks that FDA has imposed a Black Box warning on mifepristone, stating: "WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING."[114]

**WARNING: SERIOUS AND SOMETIMES FATAL INFECTIONS OR BLEEDING**

***See full prescribing information for complete boxed warning.***

**Serious and sometimes fatal infections and bleeding occur very rarely following spontaneous, surgical, and medical abortions, including following MIFEPREX use.**

- **Atypical Presentation of Infection. Patients with serious bacterial infections and sepsis can present without fever, bacteremia or significant findings on pelvic examination. A high index of suspicion is needed to rule out serious infection and sepsis. (5.1)**
- **Bleeding. Prolonged heavy bleeding may be a sign of incomplete abortion or other complications and prompt medical or surgical intervention may be needed. (5.2)**

**MIFEPREX is only available through a restricted program called the mifepristone REMS Program (5.3).**

**Before prescribing MIFEPREX, inform the patient about these risks. Ensure the patient knows whom to call and what to do if they experience sustained fever, severe abdominal pain, prolonged heavy bleeding, or syncope, or if they experience abdominal pain or discomfort or general malaise for more than 24 hours after taking misoprostol.**

168. A recent analysis in the peer-reviewed journal *BioTech* also explains claims like these are "unfounded, misleading, and entirely dangerous," indicative of "a complete disregard for the need to communicate comprehensive and truthful safety information to patients."[115] More: "It is essential to state unequivocally that there has never been a single study appropriately comparing the safety of mifepristone and acetaminophen [Tylenol] or any of the common drugs presented in these claims."[116]

---

111 Mifeprex FDA Label (approved by FDA Jan. 2023), available at perma.cc/YJF2-MSY5 (attached as Ex. 65, at 8).

112 *Id.* at 17.

113 *Id.* at 4.

114 *Id.* at 1.

115 Cameron Louttit, *The Origins and Proliferation of Unfounded Comparisons Regarding the Safety of Mifepristone*, 14 BioTech, no. 2, art. 39 (May 24, 2025), https://www.mdpi.com/3326836 (attached as Ex. 66, at 12–13).

116 *Id.* at 3.

169. *Third*, Defendants mislead consumers by claiming the abortion drug regimen they are selling is "FDA-approved." For example:

- The MAP claims: "We work with doctors in Massachusetts to prescribe FDA-approved abortion medication to patients anywhere in the US who meet eligibility for the medications and apply through our website."[117]
- A Safe Choice Network/OPTIO claims: "A medication abortion, also known as a medical abortion, refers to an abortion that results from taking a combination of two FDA-approved medications, mifepristone and misoprostol."[118]
- We Take Care Of Us claims: "Yes, the US Food and Drug Administration (FDA) approved mifepristone (the first of two medicines used in a medication abortion) in 2000."[119]
- Choices Rising claims: "Get the FDA-approved abortion pill prescribed by licensed abortion providers and delivered discreetly to your door a few days after your initial request."[120]

170. FDA, however, has approved mifepristone only "in a regimen with misoprostol, to end an intrauterine pregnancy through ten weeks gestation (70 days or less since the first day of a patient's last menstrual period.)"[121] Indeed, FDA's mifepristone label is unambiguous: "Do not take [mifepristone] if you ... [h]ave a pregnancy that is more than 70 days (10 weeks)."[122]

---

[117] Ex. 16.

[118] Safe Choice, *Medication Abortion via Telehealth*, perma.cc/P8PU-DBN8 (last visited Sept. 25, 2026) (attached as Ex. 67).

[119] We Take Care of Us, *Frequently Asked Questions*, *supra* n.81 ("Are abortion pills FDA approved?") (attached as Ex. 68).

[120] Ex. 63.

[121] FDA, *Information about Mifepristone for Medical Termination of Pregnancy Through Ten Weeks Gestation* (current as of Jan. 17, 2025), perma.cc/Z75Z-ZJ5Z (attached as Ex. 69, at 1).

[122] Ex. 65 at 17.

171. Defendants by contrast actively advertise abortion drugs for delivery where the gestational period *exceeds* FDA's ten-week limit: The MAP (through 11.5 weeks[123]), A Safe Choice Network/OPTIO (through 13 weeks[124]), Abuzz (through 13 weeks[125]), Southern Woven (through 12 weeks, 6 days[126]), We Take Care Of Us (through 12 weeks[127]), Choices Rising (through 12 weeks[128]). In fact, Choices Rising separately claims that "[a]bortion pills are safe for pregnancies up to 13 weeks and 6 days in gestation."[129] Similarly, Abuzz has combined the "safer than Tylenol" misrepresentation above with a claim that "it's also medically *safe* to take the pills after 12 weeks."[130]




172. In addition, FDA expressly recommends *against* "buying mifepristone online" where the purchase would fall outside FDA's current approved program for mifepristone—which includes

[123] The MAP, *Frequently Asked Questions*, *supra* n.25 ("Do my abortion options depend on how many weeks pregnant I am?") (attached as Ex. 70).

[124] Ex. 23 at 2.

[125] Ex. 27 at 5.

[126] Southern Woven, *Frequently Asked Questions About Abortion Pills & Our Services*, *supra* n.107 ("How far in pregnancy can I use abortion pills?") (attached as Ex. 71).

[127] We Take Care of Us, *Medication Request Form* (last visited Sept. 28, 2026), perma.cc/3CFH-7S5Q (attached as Ex. 90) (click through until date of last menstrual period).

[128] Ex. 63.

[129] Choices Rising, *FAQs*, *supra* n.87 ("Who is eligible for medication abortion services from Choices Rising?") (attached as Ex. 72).

[130] AbuzzHealth, Post on Instagram (Oct. 22, 2024), perma.cc/N4ND-MV66 (attached as Ex. 73).

the ten-week limit.[131] By advertising the prescription, sale, and use of abortion drugs for pregnancies well beyond ten weeks, therefore, Defendants are advocating a use of abortion drugs that emphatically is *not* "FDA-approved."

173. *Fourth*, and relatedly, Defendants (*e.g.*, The MAP,[132] Abuzz,[133] Choices Rising,[134] and We Take Care of Us[135]) mislead consumers by claiming a 98% rate of efficacy. That is deeply misleading because, as A Safe Choice Network/OPTIO recognize, that number (if it were valid at all) is (a) more like "96%-98%" and (b) only as to abortion drugs "[t]aken within the first 10 weeks (70 days) of pregnancy"[136]—not through 12 and 13 weeks as Defendants advertise.

174. *Fifth*, Defendants mislead consumers by claiming that pre-abortion care is unnecessary. For example:

- A Safe Choice Network/OPTIO claims: "It is important to know that an ultrasound and in-person visits with a local healthcare provider are not necessary for the vast majority of people, either before or after a medication abortion."[137]
- Choices Rising claims: "There is no need to have a Telehealth consultation."[138]
- Abuzz claims an ultrasound is unnecessary.[139]
- We Take Care Of Us claims "an ultrasound is not required."[140]

[131] Ex. 69 at 1.

[132] The MAP, *Frequently Asked Questions*, *supra* n.25 ("How do I know if the abortion pills worked?") (attached as Ex. 74).

[133] Ex. 29 at 2.

[134] Ex. 63.

[135] We Take Care of Us, *Frequently Asked Questions*, *supra* n.81 (attached as Ex. 75).

[136] Ex. 60 at 5.

[137] A Safe Choice, *How to Safely Buy Abortion Pills Online in 2026: Your Comprehensive Guide from A Safe Choice* (July 20, 2025), perma.cc/88QZ-CHBU (attached as Ex. 75, at 7).

[138] Choices Rising, *Abortion Pill (Medicated Abortion)*, *supra* n.109 (attached as Ex. 76).

[139] Ex. 29 at 4.

[140] We Take Care of Us, *Medical Request Form*, *supra* n.82 (attached as Ex. 78) (click through to ultrasound question).

175. The lack of an accurate assessment of gestational age can be fatal. Similarly, the lack of an in-person assessment for contraindications, such as the presence of an ectopic pregnancy or an Rh blood type, can be seriously detrimental—and can be fatal—to a woman's health. The lack of in-person care also prevents a healthcare provider from ensuring a woman's consent and that she is free from coercion in seeking an abortion. Indeed, all this is why Plaintiff States' laws specifically require an in-person examination before an abortion (if otherwise lawful) may be effectuated.

176. *Sixth*, Defendants facilitate confusion and mistreatment by healthcare providers in Plaintiff States by urging individuals to lie about the reasons for their symptoms.

- The MAP claims: "[I]f you are worried, you can get an ultrasound at an emergency department or through a primary care doctor or gynecologist. If you get an ultrasound, you do not need to tell them you used abortion pills. You can tell them you are pregnant and had some bleeding, and want to know if everything is OK."[141]
- A Safe Choice Network/OPTIO claims: "If you need emergency medical care at any point, you do not have to tell anyone you took abortion pills. Simply tell the provider you are pregnant and bleeding. They are trained to treat complications from pregnancy loss and will take care of you."[142]
- Abuzz claims: "The only way for the providers to know [you took abortion drugs] is if you tell or you took the pills vaginally and they see them on an internal exam. You do not need to say that you took abortion pills."[143] In response to the question "If I have to go to the hospital, what should I say?" Abuzz answers: "The

[141] The MAP, *Frequently Asked Questions*, *supra* n.25 ("I am worried that something went wrong with the abortion. What do I do?") (attached as Ex. 79).

[142] Ex. 22 at 6.

[143] Ex. 29 at 8 ("Will anyone be able to tell that I took abortion pills?").

treatment for a miscarriage and abortion are the same, so you can just say something like 'I'm bleeding but it doesn't feel like my usual period. I'm afraid something is wrong' or 'I'm pregnant and bleeding. I'm scared there's something wrong' and you should get the care you need."[144]

- Southern Woven says: "If you need ER care for any reason, 'I'm having a miscarriage' is medically accurate, and the care protocols are identical either way."[145]
- Choices Rising says: "In the unlikely event that follow-up care is necessary ... you can simply describe your symptoms as they are identical to those of a miscarriage. Any requisite follow-up treatment would also be consistent for both an abortion and a miscarriage."[146]

177. Defendants' deception is not limited to what they say—it also includes what they leave out. In particular, Defendants fail to adequately disclose material information about what women may experience after taking abortion drugs. That includes the nature and severity of potential complications, the possibility of emergency or surgical intervention, the limitations of a remote screening process, the lack of integrated local follow-up care, and the physical realities of the abortion itself.

178. Start with the nature and severity of the physical and psychological pain. Participants in a Norwegian study on abortion drugs, for example, described pain that was "out of this world," "much worse than giving birth," and "a day in hell."[147] One participant "cried and screamed for eight

[144] *Id.*

[145] Southern Woven, *How to Get the Abortion Pill Online: Step-by-Step Guide*, perma.cc/E578-AVTF (last visited Sept. 27, 2026) (attached as Ex. 80).

[146] Choices Rising, *Secure Message* (attached as Ex. 81).

[147] Idun Røseth et al., *"Out of This World": Norwegian Women's Experiences of Medical Abortion Pain*, 16 J. Multidisciplinary Healthcare 889, 892–93 (2023), https://pubmed.ncbi.nlm.nih.gov/37038454/ (attached as Ex. 82).

hours" but was turned away from the emergency hospital and told her experience was "quite normal."[148] Another study surveying 1,596 abortion-drug patients found that 41.5% of respondents rated their pain as at least an eight on a ten-point scale.[149]

179. Beyond failing to account for the physical and psychological pain, Defendants fail to adequately disclose the heightened risk of complications as a pregnancy progresses. One study, for example, found that women who took abortion drugs between 9-12 weeks gestation (as compared to women who took the drugs before 9 weeks gestation) were significantly more likely to experience hemorrhage and infection—and that they were four times more likely to have an incomplete abortion and over six times more likely to require a surgical procedure.[150] Defendants do not disclose this.

180. Defendants also do not disclose the consequences of their remotely dispensing abortion drugs. Plaintiff States' investigations confirmed that Defendants would ship abortion drugs based on fictitious pregnancy information submitted through their online intake processes. And that points up the inherent limitations of the process: Without an examination or diagnostic testing, Defendants may not reliably identify an ectopic pregnancy, confirm gestational age, determine whether an IUD remains in place, or identify other conditions bearing on whether the drugs can be safely used. This matters because even FDA identifies ectopic pregnancy, pregnancies beyond 70 days, certain bleeding conditions, and an IUD as circumstances relevant to whether mifepristone should be used.

181. Moreover, that Plaintiff States have confirmed shipments from Defendants based on fictitious individuals and men requesting and paying for abortion drugs illustrates there are no

[148] *Id.* at 892.

[149] Hannah McCulloch et al., *Expectations and Experiences of Pain During Medical Abortion at Home: A Secondary, Mixed-Methods Analysis of a Patient Survey in England and Wales*, 51 BMJ Sexual & Reproductive Health 137, 140 (2025), https://pubmed.ncbi.nlm.nih.gov/39694584/ (attached as Ex. 83).

[150] Maarit Niinimäki et al., *Comparison of Rates of Adverse Events in Adolescent and Adult Women Undergoing Medical Abortion: Population Register Based Study*, 342 BMJ d2111, 5 (2011), https://pubmed.ncbi.nlm.nih.gov/21508042/ (attached as Ex. 84).

safeguards in place: Defendants will give the domestic abuser, the husband, and the violent boyfriend abortion drugs with impunity even where a pregnant woman does not want an abortion.

182. Finally, Defendants fail to adequately disclose the limitations of the care they can provide if complications arise. Their services are intentionally remote, but Defendants do not adequately explain the consequences of that limitation. If a woman experiences severe bleeding, an incomplete abortion, infection, or another complication requiring examination or treatment, Defendants cannot provide that care remotely. The woman must instead seek care from an unrelated Plaintiff State provider who did not prescribe the drugs and did not conduct the initial evaluation (if there was one).

183. These are not collateral details. These material misrepresentations and omissions go to the very essence of the service Defendants are selling, which both violates Plaintiff States' laws and occurs without the medical oversight required by Plaintiff States' laws that are designed to protect women and girls.

## IV. Defendants' Violation of Plaintiff States' Laws Is Knowing and Intentional.

184. Defendants cannot claim ignorance of Plaintiff States' laws. Before filing this action, Plaintiff States expressly notified certain Defendants or their website hosts that their conduct violated Arkansas's and Alabama's laws and demanded that they cease their unlawful activity. The activity has not stopped.

185. Not only that, but Defendants themselves also acknowledge their conduct knowingly and intentionally violates Plaintiff States' laws—and are specifically designed to undermine Plaintiff States' laws.

186. Take The MAP. As Defendant Foster has described The MAP, "[t]he whole project is set up around distributed risk. Different people order our pills, package our pills, process the money, write the prescriptions and take the pills to the post office, which makes it harder to identify individuals

as opposed to the practice."[151] The idea, she said more recently, is to make it "really hard to identify an individual person who provided pills to an individual patient," thereby "making it much harder for someone in a red state to target them for legal action."[152]

187. And that attack on pro-life states is The MAP's entire mission. *Dobbs* was "The MAP's origin story."[153] After *Dobbs*, Defendant Foster "saw a perfect opportunity to operationalize her middle-finger rage."[154] "[S]he settled on creating an organization—that would become The MAP—offering telemedicine nationally . . . ." Foster is thus intimately involved in leading every aspect of The MAP, including by structuring and maintaining The MAP's "distributed risk" model. Because of her conduct, Foster "drastically limits how she moves within the US" by not entering pro-life states.[155]

188. Similarly after *Dobbs*, The MAP's now-medical director, Defendant Maureen Paul, joined the project "to channel her fury."[156] And when Justice Alito recently wrote that schemes like The MAP's "circumvent the [pro-life laws] that *Dobbs* made possible," The MAP's director of community engagement, Defendant Susan Yanow, giggled, "It made me so happy ... when he wrote, 'They're undermining *Dobbs*.' I was like, *yeah*, *exactly*.'"[157] Foster, for example, uses Mississippi as her "favorite example"—because Mississippi won *Dobbs*, and yet since *Dobbs*, abortions in Mississippi "have risen a mind-boggling 85 percent" due to mail-order abortion.[158]

189. As one article glowingly concluded, "Four years after the Supreme Court's *Dobbs* ... decision ended the national right to abortion, Foster and her allies have managed to create an

---

[151] Carrie N. Baker, *Massachusetts Abortion Provider Serves Patients Living in States Banning Abortion*, Ms. Magazine (July 29, 2024), perma.cc/7U25-C7QE (July 29, 2024) (attached as Ex. 85, at 10–11).

[152] Ex. 1 at 22.

[153] *Id.* at 3.

[154] *Id.* at 21.

[155] *Id.* at 23.

[156] *Id.* at 22.

[157] *Id.* at 7.

[158] *Id.* at 13.

entire healthcare, legal, and financing infrastructure—what [Paul] ... calls a 'shadow' system—that has kept abortion pills flowing, with stunning efficiency, into some of the most abortion-hostile parts of the country."[159]

190. The other Defendants share the same view. They each invariably link to the Repro Legal Helpline website, which states that, in Louisiana (and the other Plaintiff States), "[h]ealthcare professionals in the state of Louisiana cannot provide abortions except to save the life or health of the pregnant [woman]."[160] They also link to I Need An A's website, which states that "telehealth abortion is not permitted in Louisiana."[161] They thus unquestionably are aware of the illegality of their conduct—and still they persist, convinced that shield laws in their home states can protect them. And all that says nothing of their independent posts flaunting their illegal conduct.

191. Abuzz, for example, proclaims that it will mail abortion drugs to "any zip code" and "all 50 states"—"[e]ven states with bans and restrictions":



[162]



[163]

[159] *Id.* at 5.
[160] Ex. 30.
[161] Ex. 14 at 2 (expand to see all state legal info).
[162] Abuzzhealth, Post on Instagram (Feb. 27, 2026), perma.cc/B5NY-YYKP (attached as Ex. 86).
[163] Abuzzhealth, Post on Instagram (April 7, 2026), perma.cc/9BKH-DYGY (attached as Ex. 87).

192. Similarly, We Take Care Of Us proclaims:







[164][165]

193. Defendants also go to extraordinary lengths to coax individuals into concealing this unlawful activity. In its online process, Choices Rising includes a message stating: "During and after an abortion in a state where it is banned, prioritizing your personal safety and well-being is paramount, which includes protecting your privacy, seeking support from trusted sources, and understanding your legal rights. To minimize the risk of exposure, please use a secure browser, delete your search history, and follow all digital security guidelines for abortion care."[166] Similarly, A Safe Choice Network/OPTIO urge their users to: "Use a private email address unconnected to your regular accounts. Delete confirmation emails after saving your tracking information. If you share a device, clear your browsing history after visiting the site."[167]

### V. Defendants' Interstate Mail-Order Abortion Scheme Harms Plaintiff States.

194. Defendants' conduct has had its predictable and intended effect within Plaintiff States. Abortions have proliferated by the thousands in Plaintiff States after *Dobbs*. According to one study considering data through December 2025, approximately 1,000 abortions occur in Louisiana every

---

[164] We Take Care of Us, Post on Instagram (Feb. 24, 2025), perma.cc/B6K4-P2NC (attached as Ex. 88).
[165] We Take Care of Us, Post on Instagram (Nov. 10, 2025), perma.cc/3E5R-BAR4 (attached as Ex. 89).
[166] Ex. 81.
[167] Ex. 22 at 5–6.

month; approximately 300 every month in Arkansas; and approximately 700 every month in Alabama.[168] To be clear, moreover, these numbers are not hypothetical: Defendants hold records detailing the thousands of abortion drugs that have been mailed into Plaintiff States for the avowed purpose of causing abortions in Plaintiff States.

195. Embedded within these numbers are quintessential sovereign, quasi-sovereign, and economic harms suffered by Plaintiff States.

196. *First*, the very mailing of abortion drugs in Plaintiff States violates each Plaintiff State's laws—either because such mailing itself is prohibited, or because abortion drugs must be dispensed in-person after an in-person examination, or because the narrow abortion exceptions are not satisfied. *See supra* Section I. In Louisiana and Alabama, moreover, Defendants' very act of advertising abortion drugs violates state law. La. R.S. § 14:87.4(A); *see* Ala. Code § 13A-4-1(a)(1), (d)(1).

197. *Second*, given the serious health risks surrounding abortion drugs, Plaintiff States are incurring classic quasi-sovereign harms within their borders. Their laws are intended to protect the lives of unborn babies in Plaintiff States from the moment of conception—and yet Defendants' conduct terminates those lives in violation of Plaintiff States' laws. At least some Defendants know this because they routinely receive communications through their online platforms confirming that they have succeeded in terminating unborn babies' lives. Abuzz, for example, has received pictures like (and including) the following from all over the country:

[168] Ex. 10.





198. Similarly, Plaintiff States' laws are intended to protect the health and safety of women and girls in Plaintiff States—and yet Defendants' conduct actively jeopardizes that health and safety

through misrepresentations, omissions, and the dispensing of drugs that have serious adverse consequences in Plaintiff States.

199. Healthcare providers have reported that their networks are having to treat women suffering complications from the abortion drugs on a daily basis. Plaintiff States have received sworn reports that such complications include hemorrhaging requiring blood transfusions, as well as incomplete abortions requiring suction dilation and curettage to complete the abortions. That includes, for example, a woman who took drugs from Abuzz and required a suction dilation and curettage as well as a blood transfusion after she began hemorrhaging in the operating room.

200. Plaintiff States also have received sworn reports about the traumatic physical and psychological effects on their women. To take one example, Defendant Remy Coeytaux sent abortion drugs to a Louisiana woman who did not want an abortion but was coerced by her ex-boyfriend to take the drugs—and she ended up on a garage floor bleeding and in excruciating pain. To take another: Aid Access (on information and belief through Defendant JBN Operations LLC) sent abortion drugs to a Louisiana woman who coerced her teenage daughter to take them—and EMTs found her daughter bleeding on a bathroom floor holding a dead fetus.

201. Here, too, Defendants well know the severe consequences of their conduct because they routinely receive communications through their online platforms confirming the symptoms women are experiencing. Abuzz, for example, has received pictures like (and including) the following from all over the country:





202. *Third*, Plaintiff States are suffering classic pocketbook injuries from Defendants' conduct. One form of such injuries is tens of thousands of dollars that Plaintiff States have been required to devote solely to investigations into Defendants' illegal conduct and concomitant enforcement actions. Another form of such injuries is Medicaid costs. The treatment detailed above

must be covered by Plaintiff States' Medicaid programs where individuals are on Medicaid. And a substantial portion, if not a majority, of women suffering complications from abortion drugs are on Medicaid. At least one healthcare provider in Louisiana has reported that approximately half of their team's patients treated for mifepristone complications are on Medicaid. That includes the individual highlighted above who took Abuzz drugs. The State of Louisiana, moreover, is aware of multiple instances of complications due to Aid Access drugs (on information and belief shipped by JBN Operations LLC) that Louisiana Medicaid was required to cover.

203. If and when Plaintiff States receive Defendants' complete identification of the individuals in Plaintiff States to whom they prescribed and dispensed abortion drugs, Plaintiff States will be able to cross check their Medicaid databases to determine the full extent of Medicaid costs that they have incurred and continue to incur.

## <u>CAUSES OF ACTION</u>

### COUNT I
### Violation of Federal Common Law of Public Nuisance
### All Plaintiff States Against All Defendants

204. Plaintiff States reallege and incorporate by reference all preceding paragraphs.

205. Defendants' facilitation of the advertising, selling, prescribing, and mailing of abortion drugs in Plaintiff States presents a "classic" public nuisance under federal common law. *Arizona*, 40 F.4th at 386 (citation omitted); *accord Cranor*, 998 F.3d at 691–92; *see also Alfred L. Snapp & Son, Inc.*, 458 U.S. at 604 (emphasizing a sovereign state's "interest in the abatement of public nuisances, instances in which the injury to the public health and comfort [is] graphic and direct").

206. "A public nuisance is an unreasonable interference with a right common to the general public." Restatement (Second) of Torts § 821B(1). Such unreasonable interferences may arise where "the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience"; where "the conduct is proscribed by a statute,

ordinance or administrative regulation"; or where "the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right." *Id.* § 821B(2).

207. Defendants' conduct in this case satisfies each independent basis for identifying a public nuisance. *First*, Defendants' conduct significantly interferes with the public health, safety, and comfort within each Plaintiff State. *See supra* Sections II, III, IV, V. *Second*, Defendants' conduct facilitates conduct—the advertising, sale, and mailing of abortion drugs in Plaintiff States—that is plainly proscribed by Plaintiff States' laws. *See supra* Sections I, II, III, IV; *see also City of Huntington*, 157 F.4th at 567 ("One means of demonstrating an unreasonable interference with a public right is to show that a defendant's act or causal contributions to that act were 'unlawful.'" (citing the Restatement)); *Baptiste*, 965 F.3d at 220 (applying the Restatement to find a public nuisance based on the defendant's "alleged failure to operate its facility in accordance with [state law]"). And *third*, Defendants' conduct is continuing and they know or have reason to know of its ongoing consequences in Plaintiff States. *See supra* Sections II, III, IV, V.

208. Accordingly, Plaintiff States request injunctive relief, damages, and all other appropriate equitable and monetary relief necessary to abate this nuisance.[169]

**COUNT II**
**Violation of the Louisiana Unfair Trade Practices Act**
**(Conduct in Violation of La. R.S. § 40:962.2)**
**Plaintiff Louisiana Against All Defendants**

209. Louisiana realleges and incorporates by reference all preceding paragraphs.

---

[169] Given the allegations in this complaint, Plaintiff States believe that Defendants—or at least a subset of Defendants—are violating the federal Racketeer Influenced and Corruption Organizations Act (RICO) and its state law counterparts. At this time, however, Plaintiff States lack a complete picture of the full extent of Defendants' conduct. Accordingly, Plaintiff States reserve their rights to amend their complaint to add federal and state RICO claims if discovery confirms Plaintiff States' belief that Defendants are violating RICO. In addition, Plaintiff States reserve their rights to amend their complaint to add further corporate entities and individuals that discovery reveals to be implicated by the schemes detailed above.

210. The Louisiana Unfair Trade Practices Act ("LUTPA") sets forth Louisiana's statutory program prohibiting deceptive and unfair trade practices. La. R.S. § 51:1401, *et seq.* (The full title of this Chapter of the Louisiana Code is the "Unfair Trade Practices and Consumer Protection Law." *See id.*). LUTPA protects "consumers," La. R.S. § 51:1402(1), and the public by declaring that "unfair or deceptive acts or practices in the conduct of any trade or commerce are ... unlawful," La. R.S. § 51:1405(A). The Louisiana Attorney General has the power to, among other things, "investigate" and "institute legal proceedings and take such other actions" to address unfair trade practices under LUTPA. La. R.S. § 51:1404(A)(1)(a), (B).

174. Defendants' business conduct, described above, constitutes "trade" or "commerce" under LUTPA. La. R.S. § 51:1402(10). In particular, La. R.S. § 51:1402(10)(b) defines "trade" or "commerce" to "include the advertising, offering for sale, sale, or distribution of an abortion-inducing drug in violation of R.S. 40:962.2." La. R.S. § 40:962.2(A), in turn, generally prohibits any abortion drug from "be[ing] sold, prescribed, dispensed, distributed, or delivered in this state." La. R.S. § 40:962.2(B) also bars "delivery [of such a drug] to a person in Louisiana by mail-order, courier, or as a result of a sale made via the internet."

175. As detailed above, each Defendant publicly advertises, offers for sale, sells, or distributes abortion drugs in Louisiana—to be delivered by mail. That conduct plainly violates Louisiana law. And it violates the established public policy of Louisiana as expressed through its Constitution and its duly enacted statutes.

176. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Louisiana, as well as the health, safety, and well-being of Louisiana consumers who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants. It also has resulted in the deaths of unborn Louisiana babies.

211. Accordingly, Louisiana seeks a declaratory judgment that Defendants violated LUTPA, an injunction enjoining the Defendants' deceptive and unfair conduct, appropriate civil penalties per violation, damages, costs, attorneys' fees, and all other relief available under LUTPA.

**COUNT III**
**Violation of the Louisiana Unfair Trade Practices Act**
**(Unfair or Deceptive Conduct)**
**Plaintiff Louisiana Against All Defendants**

212. Louisiana realleges and incorporates by reference all preceding paragraphs.

213. Defendants also have engaged in unfair practices that offend Louisiana public policy that are substantially injurious and deceptive practices marred by deceit and misrepresentation.

214. Such practices include:

- Misrepresenting the lawfulness of medication abortion in Louisiana;
- Misrepresenting the safety, effects, and risks of abortion drugs;
- Misrepresenting FDA's approval of medication abortion;
- Misrepresenting the efficacy of medication abortion;
- Misrepresenting the need for in-person, pre-abortion care;
- Advising individuals who take their drugs to lie to healthcare providers.

198. Defendants' conduct is intentional, knowing, and reckless. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Louisiana, as well as the health, safety, and well-being of Louisiana consumers who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants. It also has resulted in the deaths of unborn Louisiana babies.

215. Accordingly, Louisiana seeks a declaratory judgment that Defendants violated LUTPA, an injunction enjoining the Defendants' deceptive and unfair conduct, appropriate civil penalties per violation, damages, costs, attorneys' fees, and all other relief available under LUTPA.

**COUNT IV**
**Violation of the Arkansas Deceptive Trade Practices Act**
**(Unconscionable Trade Practices)**
**Plaintiff Arkansas Against All Defendants**

216. Arkansas realleges and incorporates by reference all preceding paragraphs. Fed. R. Civ. P. 10(c).

217. The Arkansas Deceptive Trade Practices Act ("ADTPA") sets forth Arkansas's statutory program prohibiting deceptive and unconscionable trade practices. Ark. Code Ann. §§ 4-88-101, *et seq.*

218. The business practices of Defendants constitute the sale of "goods" or "services." Ark. Code Ann. § 4-88-102(4) and (7). The same business practices constitute business, commerce, or trade. Ark. Code Ann. § 4-88-107.

219. The ADTPA protects Arkansas consumers and the public interest in a legitimate business community by prohibiting certain business practices, including unconscionable behavior, during consumer transactions.

220. The Arkansas Supreme Court has defined unconscionable conduct as conduct that affronts one's sense of justice, decency, or reasonableness, and has explicitly held that conduct violating public policy or law is an unconscionable practice under the ADTPA. *Baptist Health v. Murphy*, 226 S.W.3d 800, 811 (Ark. 2006).

221. Arkansas law prohibits "any manufacturer, supplier, physician, or any other person to provide any abortion-inducing drug via courier, delivery, or mail service." Ark. Code Ann. § 20-16-1504(b). It also enumerates requirements for providing "an abortion-inducing drug" Ark. Code Ann. § 20-16-1504(c), and the procedures that must be followed by physicians. *See generally* Ark. Code Ann. § 20-16-1504 *et seq.*

222. Defendants, in the course of business, commerce, or trade, have engaged in unconscionable acts and practices by knowingly and systematically:

a. Circumventing and evading Arkansas statutes governing the provision of abortion-related services and the practice of medicine;

b. Marketing, prescribing, selling, and distributing abortion drugs into Arkansas in open defiance of Arkansas law;

c. Structuring their telehealth operations specifically to avoid compliance with or detection by Arkansas's regulatory and licensing regulatory structures; and

d. Encouraging, facilitating, and normalizing widespread noncompliance with Arkansas law among Arkansas residents.

223. Defendants' conduct is not only unconscionable because it violates state law, but also because it endangers the health and safety of Arkansas women and girls. In the course of business, commerce, or trade, Defendants have engaged in unconscionable acts and practices by prescribing and distributing abortion drugs to Arkansas women and girls in violation of Arkansas law designed to protect their safety.

224. Defendants' practices exposed and continue to expose Arkansas women and girls to a substantial risk of harm, including but not limited to:

a. Dispensing abortion drugs without the in-person examination required by Arkansas law and without screening for circumstances material to their use, including ectopic pregnancy, gestational age limits, IUD placement, and blood type;

b. Advising women and girls not to tell Arkansas medical providers they took abortion drugs, even in cases of emergency; and

c. Advising Arkansas women and girls not to follow standard medical procedures recommended by the FDA and required by Arkansas law.

225. These practices unconscionably disregard patient safety in favor of expanding access to illegal transactions, shift the burden of risks to patients and Arkansas's healthcare system, and exploit Arkansas women and girls' vulnerabilities in making time-sensitive and high-risk medical decisions.

226. Defendants' conduct offends established public policy of Arkansas as expressed through its Constitution and its duly enacted statutes.

227. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Arkansas, as well as the health, safety, and well-being of Arkansas women and girls who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants.

228. The deceptive practices alleged above were carried out through the coordinated conduct of Defendants. Each Defendant either directly engaged in a prohibited practice and is therefore liable, or knowingly facilitated, assisted, intermediated, or otherwise aided its operation or continuance, in violation of Ark. Code Ann. § 4-88-107(a)(12). To the extent a Defendant facilitated or aided another Defendant's violation, that Defendant knew or reasonably should have known of the facts giving rise to the violation and is jointly and severally liable under Ark. Code Ann. § 4-88-113(d).

229. Accordingly, Arkansas seeks a declaratory judgment that Defendants violated ADTPA, an injunction enjoining the Defendants' unconscionable conduct, civil penalties of $10,000 per violation, damages, costs, attorneys' fees, and all other relief available under ADTPA.

**COUNT V**
**Violation of the Arkansas Deceptive Trade Practices Act**
**(Knowing Misrepresentations)**
**Plaintiff Arkansas Against All Defendants**

230. Arkansas realleges and incorporates by reference all preceding paragraphs. Fed. R. Civ. P. 10(c).

231. Under ADTPA, it is unlawful to "knowingly make a false representation as to the characteristics, ingredients, uses, benefits, alterations, source, approval, or certification of goods or services." Ark. Code Ann. § 4-88-107(a)(1). It is similarly unlawful to make a false representation as to whether the goods are of a particular standard, quality, grade, or model. *Id.*

232. Defendants, in the course of marketing and providing abortion drugs, have made false and misleading representations regarding the safety, efficacy, legality, and risks associated with such drugs. These misrepresentations include, but are not limited to:

a. Statements that minimize the frequency or severity of potential complications;

b. Statements that downplay the failure rate of abortion drugs, and the associated complications;

c. Statements that downplay the seriousness of ingesting abortion drugs;

d. Statements that minimize the need for in-person care before receiving abortion drugs, including standard screening measures and follow-up care;

e. Representations that state or imply that Defendants' products and services are FDA approved or in compliance with FDA guidelines and requirements; and

f. Representations that state or imply that Defendants' sale and delivery of abortion drugs to Arkansas women and girls is lawful.

233. The deceptive practices alleged above were carried out through the coordinated conduct of Defendants. Each Defendant either directly engaged in a prohibited practice and is therefore liable, or knowingly facilitated, assisted, intermediated, or otherwise aided its operation or continuance, in violation of Ark. Code Ann. § 4-88-107(a)(12). To the extent a Defendant facilitated or aided another Defendant's violation, that Defendant knew or reasonably should have known of the facts giving rise to the violation and is jointly and severally liable under Ark. Code Ann. § 4-88-113(d).

234. Accordingly, Arkansas seeks a declaratory judgment that Defendants violated ADTPA, an injunction enjoining the Defendants' unconscionable conduct, civil penalties of $10,000 per violation, damages, costs, attorneys' fees, and all other relief available under ADTPA.

## COUNT VI
## Violation of the Arkansas Deceptive Trade Practices Act
## (Deceptive Trade Practices—Material Omissions)
## Plaintiff Arkansas Against All Defendants

235. Arkansas realleges and incorporates by reference all preceding paragraphs. Fed. R. Civ. P. 10(c).

236. The ADTPA also prohibits the use of deception, fraud, or false pretenses in connection with advertising or a sale, as well as the "concealment, suppression, or omission of any material fact with the intent that others rely upon the concealment, suppression, or omission" while selling any goods or services. Ark. Code Ann. § 4-88-108(a)(1)–(2).

237. A material fact is one that could affect the consumer's conduct or decision when deciding to purchase the product. Materiality is presumed if the practice involves the health, safety, or other significant area where a reasonable consumer would be concerned. Federal Trade Commission, FTC Policy Statement on Deception, appended to Cliffdale Assocs., Inc., 103 F.T.C. 110, 174 (1984) at pp.1–6.

238. Defendants have also engaged in material omissions, including failure to adequately disclose:

a. The full range and likelihood of serious adverse events;

b. The importance of in-person medical evaluation in certain circumstances;

c. The limitations of remote screening and associated risk; and

d. The potential need for emergency medical care and the lack of integrated follow-up services.

239. These misrepresentations and omissions are material and likely to influence a reasonable consumer's decision to obtain abortion drugs from Defendants.

240. Defendants' conduct has caused significant harm, not only to individual patients, but also to healthcare providers and emergency services within Arkansas, as well as the integrity of the medical marketplace.

241. Accordingly, Arkansas seeks a declaratory judgment that Defendants violated ADTPA, an injunction enjoining the Defendants' false representations, omissions, concealments, and suppressions described throughout this Complaint, civil penalties of $10,000 per violation, damages, costs, attorneys' fees, and all other relief available under ADTPA.

**COUNT VII**
**Violation of the Alabama Deceptive Trade Practices Act**
**(Unconscionable Trade Practices)**
**Plaintiff Alabama Against All Defendants**

242. Alabama realleges and incorporates by reference all preceding paragraphs.

243. Alabama's Deceptive Trade Practices Act exists to protect "[t]he public health, welfare and interest" of "both the consuming public and the legitimate businessperson." Ala. Code § 8-19-2. The Act is enforceable by the Alabama Attorney General. *See* Ala. Code § 8-18-4.

244. Defendants' business conduct constitutes "trade or commerce" within the scope of the Act. Ala. Code § 8-19-3(14).

245. The Act prohibits any "unconscionable ... act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(27).

246. Defendants' conduct is "unconscionable" under the Act in at least two ways: it violates the public policy of Alabama and endangers the health and safety of Alabama women and girls.

247. Alabama law strictly prohibits "giving, selling, dispensing, administering, or otherwise providing or prescribing" "abortion-inducing drug[s]" except in very limited circumstances, which

(among other things) require an in-person examination and a determination that the abortion is necessary to prevent a serious health risk to the mother. Ala. Code § 26-23E-7; *see* Ala. Code § 26-23H-4; Ala. Code § 13A-3-7. Abortion is against the public policy of the state. Ala. Const. Art I., § 36.06.

248. Defendants have and are engaged in unconscionable acts and practices in the conduct of trade or commerce by, among other things:

a. Circumventing and evading Alabama law governing the provision of abortion-related services and the practice of medicine;

b. Marketing, selling, dispensing, administering, prescribing, or otherwise distributing abortion drugs into Alabama in open defiance of Alabama law;

c. Structuring their telehealth operations specifically to avoid compliance with or detection by Alabama's regulatory and licensing regulatory structures; and

d. Encouraging, facilitating, and normalizing widespread noncompliance with Alabama law among Alabama residents.

249. Defendants' conduct is not only unconscionable because it violates state law but also because it endangers the health and safety of Alabama women and girls. In the conduct of trade or commerce, Defendants have engaged in unconscionable acts and practices by prescribing and distributing abortion drugs to Alabama women and girls in violation of Alabama law designed to protect their safety.

250. Defendants' practices exposed and continue to expose Alabama women and girls to a substantial risk of harm, including but not limited to:

a. Dispensing abortion drugs without the in-person examination required by Alabama law and without screening for circumstances material to their use such as ectopic pregnancy, gestational age limits, IUD placement, and blood type;

b. Advising women and girls not to tell Alabama medical providers they took abortion drugs, even in cases of emergency; and

c. Advising Alabama women and girls not to follow standard medical procedures recommended by the FDA and required by Alabama law.

251. These practices unconscionably disregard patient safety in favor of expanding access to illegal transactions, shift the burden of risks to patients and Alabama's healthcare system, and exploit Alabama women and girls' vulnerabilities in making time-sensitive and high-risk medical decisions.

252. Defendants' conduct offends the established public policy of Alabama as expressed through its Constitution and its duly enacted statutes.

253. Defendants' conduct has caused substantial injury to the public interest and public marketplace, including the erosion of the integrity of regulated markets within Alabama, as well as the health, safety, and well-being of Alabama women and girls who purchased abortion drugs from Defendants or were solicited for such purchase by Defendants.

254. Accordingly, Alabama seeks a declaratory judgment that Defendants violated Alabama's Act, an injunction enjoining the Defendants' unconscionable conduct, civil penalties, damages, costs, attorneys' fees, and all other relief available under Alabama's Act.

**COUNT VIII**
**Violation of the Alabama Deceptive Trade Practices Act**
**(Misleading or Deceptive Trade Practices)**
**Plaintiff Alabama Against All Defendants**

255. Alabama realleges and incorporates by reference all preceding paragraphs.

256. Under Alabama's Deceptive Trade Practices Act, it is unlawful to, "[c]aus[e] confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services," "[r]epresent[] that goods or services have sponsorship, approval, characteristics, ingredients, uses,

benefits, or qualities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have," or "[e]ngag[e] in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5(2), (5), (27).

257. In the course of marketing and providing abortion drugs, Defendants have represented that the drugs have certain qualities or approval that they do not have and have caused confusion or misunderstanding about the approval of the drugs. Such representations include but are not limited to:

a. Representations that state or imply that Defendants' products and services are FDA approved or in compliance with FDA guidelines and requirements; and

b. Representations that state or imply that Defendants' sale and delivery of abortion drugs to Alabama women and girls is lawful.

258. Defendants have also made false, misleading, or deceptive representations regarding the safety, efficacy, legality, and risks associated with the abortion drugs. These include but are not limited to:

a. Statements that minimize the frequency or severity of potential complications;

b. Statements that downplay the failure rate of abortion drugs, and the associated complications;

c. Statements that downplay the seriousness of ingesting abortion drugs;

d. Statements that minimize or misrepresent the need for in-person care before receiving abortion drugs, including standard screening measures and follow-up care;

e. Statements that misrepresent the safety, effects, and risks of abortion drugs;

f. Statements that advise individuals who take their drugs to lie to healthcare providers.

259. Accordingly, Alabama seeks a declaratory judgment that Defendants violated Alabama's Deceptive Trade Practices Act, an injunction enjoining the Defendants' misleading or deceptive conduct, civil penalties, damages, costs, attorneys' fees, and all other relief available under Alabama's Act.

**PRAYER FOR RELIEF**

Plaintiff States therefore request that the Court enter an order and judgment that grants the following relief, which it is authorized to do under 28 U.S.C. § 2201, Federal Rules of Civil Procedure 57 and 65, its equitable powers, and La. R.S. § 51:1401, *et seq.*, Ark. Code Ann. §§ 4-88-101, *et seq.*, and Ala. Code § 8-19-1, *et seq*:

A. Declaring that the conduct alleged herein constitutes a public nuisance under federal common law;

B. Requiring Defendants to abate the public nuisance described herein and to deter or prevent the resumption of such nuisance;

C. Ordering an injunction against Defendants' prohibited conduct in Plaintiff States;

D. Declaring that Defendants' conduct is in violation of LUTPA, ADTPA, and Alabama's Deceptive Trade Practices Act;

E. Enjoining Defendants from continuing the deceptive, unfair, and unconscionable business practices as described throughout this Complaint;

F. Disgorging all revenue derived from Defendants' unlawful, unconscionable, and deceptive acts and practices as alleged herein;

G. Awarding actual and compensatory damages;

H. Awarding civil penalties per each violation of Defendants' deceptive and unconscionable business practices in each Plaintiff State;

I. Awarding statutory damages in the maximum amount permitted by law;

J. Awarding reasonable attorneys' fees and costs of suit;

K. Awarding pre-judgment and post-judgment interest; and

L. Awarding any such other and further relief as the Court deems just and proper.

Respectfully submitted,

**LIZ MURRILL**
**ATTORNEY GENERAL OF LOUISIANA**

*/s/ J. Benjamin Aguiñaga*
J. BENJAMIN AGUIÑAGA*
Solicitor General
*/s/ Caitlin Huettemann*
CAITLIN HUETTEMANN
Assistant Solicitor General
OFFICE OF THE LOUISIANA
ATTORNEY GENERAL
1885 N. Third Street
Baton Rouge, La 70802
Telephone: (225) 506-3746
AguinagaB@ag.louisiana.gov
HuettemannC@ag.louisiana.gov

*Counsel for Louisiana*

**TIM GRIFFIN**
**ATTORNEY GENERAL OF ARKANSAS**

*/s/ Autumn Hamit Patterson*
AUTUMN HAMIT PATTERSON*
Solicitor General
BRITTANY EDWARDS*
Senior Assistant Attorney General
OFFICE OF THE ARKANSAS
ATTORNEY GENERAL
101 West Capitol Avenue
Little Rock, AR 72201
Telephone: (501) 682-2007
autumn.patterson@arkansasag.gov
brittany.edwards@arkansasag.gov

*Counsel for Arkansas*

**STEVE MARSHALL**
**ATTORNEY GENERAL OF ALABAMA**

*/s/ A. Barrett Bowdre*
A. BARRETT BOWDRE*
Solicitor General
STATE OF ALABAMA

OFFICE OF THE ATTORNEY GENERAL
501 Washington Avenue
Montgomery, AL 36104
Telephone: (334) 242-7300
barrett.bowdre@alabamaag.gov

**Application for admission pro hac vice forthcoming*